UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CLEAN CRAWL, INC.,

                    Plaintiff,

        v.

CRAWL SPACE CLEANING PROS,
INC.,

                    Defendant.

CASE NO. C17-1340 BHS

ORDER DENYING IN PART, AND
GRANTING IN PART,
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT, AND
REQUESTING ADDITIONAL
BRIEFING

This matter comes before the Court on Defendant Crawl Space Cleaning Pros,

Inc.'s ("CSCP") motion for summary judgment or partial summary judgment. Dkt. 39.

The Court has considered the pleadings filed in support of and in opposition to the

motion and the remainder of the file and hereby denies the motion in part, grants the

motion in part, and reserves ruling and requests supplemental briefing in part for the

reasons stated herein.

## I.  PROCEDURAL HISTORY AND FACTUAL BACKGROUND

This suit arises from copyright and trademark disputes between Plaintiff Clean

Crawl, Inc. ("CCI") and CSCP, two businesses which clean attic and crawls spaces and

provide pest exclusion services for homes in the Western Washington area. *See* Dkts. 48 at 7, 39 at 2.

CCI began doing business in its current iteration in 2001 when its president, Charles Henrichsen ("Henrichsen"), transferred his Bio Bug Pest Management, Inc. business to CCI, Dkt. 48 at 6, and began using the trade name CLEAN CRAWLS, Dkt. 49, Declaration of Charles Henrichsen ("Henrichsen Decl.") at 3.[1] CSCP, using the trade name Crawl Pros, began operations on January 9, 2013 under founder and owner Richard Herron ("Herron"). Dkt. 39 (citing Dkt. 40, Declaration of Richard Herron ("Herron Decl."), at 1). CCI provides "air duct cleaning services, animal contamination cleaning and disposal services, pest control for commercial and residential buildings, and environmental containment." Dkt. 48 at 7 (citing Henrichsen Decl. at 2–3, 6–7). CSCP provides "crawlspace and attic cleaning and restoration, insulation installation, crawl space encapsulation and sealing, rodent exclusion, duct sealing, and water mediation and flooding." Dkt. 39 at 2 (citing Herron Decl. at 1). CSCP characterizes the nature of the two companies' businesses as "substantially similar." Dkt. 39 at 2. CCI confirms this, stating that "[i]t is undisputed that both companies provide identical, directly competing services." Dkt. 48 at 24.

Henrichsen declares that he met Herron in 2008 through an insulation and energy efficiency industry association and mentored Herron in starting a business, Sustainable Building and Insulation ("SBI"). Henrichsen Decl. at 3–4. Henrichsen declares that he

---

[1] The Court refers to ECF pagination throughout this Order if available.

made SBI a CCI subcontractor, and one of his employees, CCI sales representative Jared Pullen ("Pullen"), referred "many jobs" to SBI. *Id.* at 4. Henrichsen declares that these referrals allowed Pullen and Herron to be "heavily exposed" to CCI's "family of trademarks and copyrights" between 2010 and 2013. *Id.* Henrichsen also declares that all of CCI's copyrighted materials at issue "were substantially completed in the form registered in the 2008-2009 time frame." *Id.* at 5. Finally, Henrichsen declares that CCI has used its trademarks and copyrights with customers in fourteen western Washington counties since 2010. *Id.* at 6. CCI registered a service mark for "a gold amorphous dirt blot to the left of a slightly superimposed by the blue capitalized words 'CLEAN CRAWLS'" on August 31, 2010 with the United States Patent and Trademark Office ("USPTO"). Dkt. 57-1 at 47.

Henrichsen specifically declares that by 2012, Herron and Pullen "knew and had used repeatedly in association with [CCI] its family of trademarks," including the CLEAN CRAWLS trade name, WE GO WHERE YOU DON'T WANT TO ("Slogan One"), and WE DO THE WORK YOU DON'T WANT TO ("Slogan Two") (collectively "the family of marks"). Henrichsen Decl. at 4. Henrichsen declares that CCI typically has not used its slogans in printed advertising or on company vehicles or other items, "instead using them primarily on the Internet and verbally with customers, associates, and the public." *Id.* at 7. Henrichsen and others at CCI declare that CCI has used the Slogans extensively dating back to at least 2010. *See, e.g.* Henrichsen Decl. at 4; Dkt. 50 Declaration of Vice President of CCI Dale Gjerness ("Gjerness Decl.") at 4–5; Dkt. 52, Declaration of Patrick J. Smith ("Smith Decl."), at 1.

CSCP began operations in early 2013, using Slogan One extensively to brand its business. *See* Herron Decl. at 6–41. In 2013, CSCP placed the slogan in advertising, on company cars and trucks, and on its company headquarters. *Id.* at 6–24. Between 2014 and 2017, CSCP expanded its use of Slogan One to include business cards, customer giveaways, a domain name, advertising, its payment authorization form, and company jackets. *Id.* at 25–41. On April 15, 2014, CCI registered a service mark for "an amorphous water blot to the left of and slightly superimposed by the capitalized words 'CLEAN CRAWLS'" with the USTPO. Dkt. 57-1 at 49.

On March 20, 2017, CSCP applied to register Slogan One with Washington as a trademark in class 37, registering it for use with "[c]leanup of crawl spaces and attics and insulation installation services." Dkt. 41, Declaration of Emilia L. Sweeney ("Sweeney Decl."), at 5–14. Also in March 2017, Herron declares that CSCP "learned that CCI had begun using [Slogan One] on CCI's website," and so asked CCI to cease and desist. Herron Decl. at 3–4. Herron declares that CSCP received a favorable response, but later found the CCI "had added a TM to the end of [Slogan One] and was also using the confusingly similar [Slogan Two] on its website." *Id.* CCI alleges that it first became aware of CSCP's infringement in 2017 "after investigation prompted by [CSCP's] accusation of trademark infringement against [CCI]." Dkt. 48 at 9.

CCI submitted an application for protection of Slogan One on July 6, 2017 with the USPTO. Dkt. 57-1 at 51. CSCP also filed for protection of Slogan One with the USPTO, which issued a Notice of Publication on July 12, 2017, announcing its intent to register Slogan One to CSCP. Sweeney Decl. at 15–24.

On August 14, 2017, CSCP filed a complaint against CCI in the Pierce County Superior Court for violation of Washington's Trademark Registration Act, RCW Chapter 19.77 *et seq.*, common law trademark infringement, and violation of Washington's Consumer Protection Act ("CPA"), RCW Chapter 19.86. Dkt. 39 at 5.

On September 6, 2017, CCI filed this lawsuit against CSCP, alleging copyright infringement, trademark infringement, false designation of origin and unfair competition, and violation of the CPA, and seeking a permanent injunction against infringement of the copyrighted materials and the trademarked materials, destruction of all infringing materials, damages, and other relief. Dkt. 1. On October 10, 2017, CCI registered Slogan Two as a service mark with the USPTO. Dkt. 57-1 at 53. On November 28, 2017, CCI filed a Notice of Opposition to CSCP's application for protection of Slogan One with the federal Trademark Trial and Appeal Board. Sweeney Decl. at 26–31. This Notice cites CCI's July 6 application for protection of Slogan One. *See* Dkt. 57-1 at 51. [2] On February 27, 2018, CCI registered a service mark which "consists of the wording 'Clean Crawls' in white and outlined in navy blue . . . centered upon a blue splash, which is centered on a blue background . . . ." with the USPTO. Dkt. 57-1 at 55. On March 19, 2018, CSCP filed an amended answer in the instant case, asserting counterclaims and affirmative defenses. Dkt. 32. On March 27, 2018, CCI registered a service mark consisting of the words CLEAN CRAWLS with the USPTO, and registered another

---

[2] CSCP informed the Court that this proceeding is suspended pending the outcome of the instant suit. Dkt. 39 at 4.

service mark consisting of the words CLEAN CRAWLS in blue next to a splash image in grey on June 12, 2018. Dkt. 57-1 at 57–59.

On September 6, 2018, CSCP filed the instant motion for summary judgment. Dkt. 39. On October 8, 2018, CCI responded. Dkt. 48. On October 19, 2018, CSCP replied. Dkt. 60. On October 22, 2018, CCI filed a surreply. Dkt. 61.[3]

## II.   DISCUSSION

**A.    Summary Judgment Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or

---

[3] The Court has also reviewed CCI's Motion for Leave to Supplement the Record, Dkt. 74, and finds that the information provided does not alter the conclusions the Court reaches in this Order.

jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

**B.    Trademark Claims**

CCI makes three primary trademark allegations: first, that CSCP's trade name creates a strong likelihood of consumer confusion with its own, second, that CCI has the rights to Slogan One and CSCP's use is of Slogan One is directly infringing, and third, that CSCP's use of Slogan One creates a likelihood of confusion with and thus infringes CCI's rights in Slogan Two. Dkt. 1, ¶¶ 15–20, 24–27. CCI claims violation of 15 U.S.C. § 1114 and/or Washington common law, and false designation of origin and unfair competition in violation of 15 U.S.C. § 1125. Dkt. 1, ¶¶ 40–43.

"The Lanham Act [15 U.S.C. §§ 1051 *et seq*.] provides national protection of trademarks in order to secure the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers." *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 198 (1985). "Because of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1140 (9th Cir. 2002); *see also, e.g., Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1029, 1031 (9th Cir. 2010); *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1202 (9th Cir. 2012).

### 1.    The Clean Crawls Trade Name

Proof of trademark infringement requires a showing that the defendant used a mark similar enough to "produce confusion in the minds of consumers about the origin of the goods or services in question." *KP Permanent Make-Up v. Lasting Impression I, Inc.*, 543 U.S. 111, 117 (2004)). "Likelihood of confusion is a factual determination," and courts often find likelihood of confusion is best determined by the jury. *Fortune Dynamic*, 618 F.3d at 1031 (quoting *Thane Int'l., Inc v. Trek Bicycle Corp*., 305 F.3d 894, 901 (9th Cir. 2002).

Courts use the eight *Sleekcraft* factors to assess likelihood of consumer confusion among similar trademarks, assessing: "(1) the similarity of the marks; (2) the strength of the plaintiff's mark; (3) the proximity or relatedness of the goods or services; (4) the defendant's intent in selecting the mark; (5) evidence of actual confusion; (6) the marketing channels used; (7) the likelihood of expansion into other markets; and (8) the

degree of care likely to be exercised by purchasers of the defendant's product." *Fortune Dynamic*, 618 F.3d at 1030–31 (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.3d 341 (9th Cir. 1979)). "This eight-factor analysis is 'pliant,' illustrative rather than exhaustive, and best understood as simply providing helpful guideposts" for analysis. *Fortune Dynamic*, 618 F.3d at 1030–31.

CSCP seeks summary judgment on CCI's trademark claim for the CLEAN CRAWLS trade name on the ground that CCI cannot establish a likelihood of confusion necessary to prove its claim of infringement. Dkt. 39 at 2. In the alternative, CSCP argues that CCI's trademark for the CLEAN CRAWLS trade name is invalid because the name is generic, and thus ineligible for trademark protection. *Id*. CSCP further argues that the CLEAN CRAWLS mark is weak and dissimilar to CSCP's mark, "mak[ing] consumer confusion highly unlikely." *Id.* at 13. CCI argues that the marks are confusingly similar and that since its complaint was filed, CSCP "has been using the even more confusingly similar mark CRAWL PROS" so "the trademark infringement analysis must evaluate [CSCP]'s use of both marks," CRAWL SPACE CLEANING PROS and CRAWL PROS. Dkt. 48 at 18. Because the analytical points in the strength of the mark factor also address whether the mark is eligible for protection at all, the Court considers that factor first.

**Strength of the mark.** The strength of the protected mark, "is evaluated in terms of its conceptual strength and commercial strength." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000) (internal citation omitted). "From weakest to strongest, marks are categorized as generic, descriptive, suggestive, and arbitrary or fanciful." *GoTo.com,* 202 F.3d at 1207 (citing *Brookfield Commc'ns v. West Coast*, 174

F.3d 1036, 1058 (9th Cir. 1999)). "[T]he most distinctive marks—i.e., arbitrary and fanciful marks—receive the most trademark protection, whereas the least distinctive marks—i.e., generic marks—receive no trademark protection." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1126 (9th Cir. 2014) (citing *Entrepreneur Media*, 279 F.3d at 1141).

CSCP argues that CCI's mark is descriptive at best, Dkt. 39 at 14, and generic at worst. *Id.* at 17. CCI argues that it owns a federal registration for the word mark CLEAN CRAWLS[4] and four other registrations for those words "stylized or with a design element," and therefore benefits from the presumption that the mark is protectable. Dkt. 48 at 19 (citing 15 U.S.C. §§ 1057(b), 1115(a)). Generic terms refer to "the genus of which the particular product or service is a species" and "cannot become a trademark under any circumstances. *Surgicenters of America, Inc. v. Medical Dental Surgeries, Co.*, 601 F.2d 1101, 1014 (9th Cir. 1979) (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9–11 (2nd Cir. 1976)). Descriptive marks "define qualities or characteristics of a product in a straightforward way," *Entrepreneur Media*, 279 F.3d at 1141–42, and may be valid trademarks only "by acquiring a secondary meaning, i.e. becoming 'distinctive of the applicant's goods,'" *Surgicenters*, 601 F.2d at 1014 (citing *Abercrombie*, 537 F.2d at 10). "[S]uggestive marks convey impressions of goods that require the consumer to 'use imagination or any type of multistage reasoning to understand the mark's significance.'" *Pom Wonderful*, 775 F.3d at 1126 (quoting

---

[4] CCI registered its trademark for the word mark on March 27, 2018. Dkt. 57-1 at 57.

*Entrepreneur Media*, 279 F.3d at 1141–42). Additionally, a mark consisting of two or more components, or 'composite mark' "may become a distinguishing mark even though its components individually cannot." *California Cooler, Inc. v. Loretto Winery Ltd.*, 774 F.2d 1451, 1455 (9th Cir. 1985); *see also W.W.W. Pharm Co. v. Gillette Co.*, 808 F. Supp. 1013, 1022 (S.D.N.Y. 1992) ("Although 'sport' and 'stick' are both generic or descriptive terms when viewed individually, the composite term SPORTSTICK is stronger than the sum of these two components."), *aff'd* 984 F.2d 567 (2nd Cir. 1993). "Under the anti-dissection rule, the validity and distinctiveness of a composite trademark is determined by viewing the trademark as a whole, as it appears in the marketplace." *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1392 (9th Cir. 1993).

The Court finds there is at least a question of material fact as to whether the mark CLEAN CRAWLS is suggestive, and thus eligible for registration as a trademark. *See Pom Wonderful*, 775 F.3d at 1126. "Two tests are commonly used to measure the strength of a mark, the 'imagination test,' and the 'need test.'" *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1218 (9th Cir. 1987) *overruled on other grounds, Perfect 10 v. Google, Inc.*, 653 F.3d 976 (9th Cir. 2011). The imagination test distinguishes between suggestive and descriptive marks, asking whether a consumer "must use imagination or any type of multistage reasoning to understand the mark's significance." *Entrepreneur Media*, 279 F.3d at 1142 (citing *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1048 n.8 (9th Cir. 1998)). This test evaluates the mark in the context of the goods or services at issue; for example, "the mark BRILLIANT may be 'descriptive' on diamonds, 'suggestive' on furniture polish, and 'arbitrary' on canned

applesauce." *Rodeo Collection*, 812 F.2d at 1218 (citing 1 J.T. McCarthy, *Trademarks and Unfair Competition*, § 11:20 at 489 (2nd ed. 1984)). The needs test "asks whether 'the suggestion made by the mark is so remote and subtle that it is really not likely to be needed by competitive sellers to describe their goods." *Fortune Dynamic*, 618 F.3d at 1033–34 (quoting *Zobmondo Entertainment, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1116 (9th Cir. 2010)). "The two tests are related, because '[t]he more imagination that is required to associate a mark with a product [or service,] the less likely the words used will be needed by competitors to describe their products [or services].'" *Rodeo Collection*, 812 F.2d at 1215 (quoting *Union Carbide Corp. v. Every-Ready Inc.*, 531 F.2d 366, 279 (7th Cir. 1976), *cert. denied*, 429 U.S. 830 (1976)).

Arguing that the mark is generic, CSCP provides the definition of 'clean' and the definition of 'crawl space,' and provides examples of the usage of the term 'crawl space' in news stories. Dkt. 39 at 18. However, consideration of the words only as separate entities violates the anti-dissection rule. *Official Airline Guides*, 6 F.3d at 1392. While the term 'crawl space' may well be widely understood by the public, and 'crawl space cleaning' could arguably be "identified with all such goods or services, regardless of their suppliers," making it "generic and so not a valid mark," *Surgicenters*, 601 F.2d at 1016 (citing *King-Seeley Thermos Co. v. Aladdin Industries, Inc.*, 321 F.2d 577, 579 (2nd Cir. 1963), the Court finds that a reasonable juror could conclude some element of imagination is needed to understand the CLEAN CRAWLS mark, *Entrepreneur Media*, 279 F.3d at 1141–42.

"While not determinative, dictionary definitions are relevant and often persuasive in determining how a term is understood by the consuming public . . ." *Fortune Dynamic*, 618 F.3d at 1033 (quoting *Surgicenters*, 601 F.2d at 1015 n.11). Webster's contains seven definitions of 'crawl' as a verb, two definitions of 'crawl' as a transitive verb, and four definitions of 'crawl' as a noun, none of which mention anything about or refer to the separate entry for a 'crawl space,' the "space about two feet high provided in a building in order to enable workmen to gain access to plumbing, wiring, and other equipment." Webster's Third New International Dictionary Unabridged at 531 (2002). These definitions suggest that 'crawl' may not be understood to describe a space in a home without the modifier 'space.' *See Surgicenters*, 601 F.2d at 1018–19. CSCP argues that consumers "would require no more imagination to know CCI's service offerings than [they] would if CCI's mark was CLEAN HOUSES for housecleaning services." Dkt. 60 at 6. However, the Court reasons that the level of imagination may be greater: CLEAN CRAWLS is more analogous to a hypothetical mark 'CLEAN HOT,' which requires some element of imagination to understand a reference to a hot tub cleaning service. *See Entrepreneur Media*, 279 F.3d at 1142. Just as "[a] person would not be likely to picture a shopping center upon first hearing the name 'Rodeo Collection,'" the Court finds at least a question of material fact exists whether a person would picture a cleaning service for a particular space in a home upon first hearing the name CLEAN CRAWLS. *See Rodeo Collection*, 812 F.2d at 1215.

Regarding competitor needs, CSCP argues that if CCI was allowed to sue for infringement on CLEAN CRAWLS, CSCP as a competitor "could not describe [its]

goods as what they are." Dkt. 39 at 18 (quoting *Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*, 198 F.3d 1143, 1151 (9th Cir. 1999)). CSCP argues that it would be "precluded from indicating that it offers any type of cleaning service, or that it provides services in the spaces in the home typically called a crawl space or an attic." Dkt. 39 at 18. The Court finds this argument unpersuasive. CCI does not claim protection for the term 'crawl space.' CSCP does not explain how the word 'attic' would be implicated. Further, the certificate of registration for the word mark CLEAN CRAWLS specifically states "No claim is made to the exclusive right to use the following apart from the mark as shown: 'CLEAN' AS TO INT. CLASSES 37 AND 40." Dkt. 57-1 at 57.[5] Finally, CCI provides examples of four other companies providing crawl space cleaning services which "are able to advertise their services in a manner far less confusing than [CSCP]." Dkt. 48 at 24 (citing Dkt. 57, Declaration of David A. Lowe at 2–3 ("'Oasis Attic and Crawls', https://www.oasiscrawls.com/, 'A Better Crawl, Inc.', https://www.crawlspacespcecialist.com/, 'Rainy Day Basement Systems', https://www.rainydaybasementsystems.com/, 'Atticare', https://atticareusa.com/")).

Finding that a questions of material fact exists as to whether the mark is suggestive, the Court turns next to commercial strength, the second half of the analysis for the strength of the mark. *GoTo.com*, 202 F.3d at 1207.

Courts assess a mark's commercial strength by considering its actual marketplace recognition, and, on one hand, may consider evidence of substantial advertising

---

[5] Int. Class 37 is the trademark class including "cleaning of attics and crawl spaces" and Int. Class 40 is the trademark class for air deodorizing. *Id.*

expenditures, substantial sales, and widely distributed advertising campaigns "sufficient to make the relative commercial strength of the . . . mark a question for the jury." *Fortune Dynamic*, 618 F.3d at 1034 (citing *Brookfield*, 174 F.3d at 1058). On the other hand, the Ninth Circuit has "rejected the contention that extensive advertising automatically transforms a suggestive mark into a strong one." *Nutri/System, Inc. v. Con-Stan Industries, Inc.* 809 F.2d 601, 605 (9th Cir. 1987) (citing *Sleekcraft*, 599 F.2d at 350). CCI asserts that "[s]ince 2010 alone" it has "invested more than $4.5 million in advertising its services under its brands, and generated more than $90 million revenues [sic]," and argues that multiple business awards and favorable customer reviews show strong brand recognition. Dkt. 48 at 21 (citing Henrichsen Decl. at 6–7; Gjerness Decl. at 4–5). While the Court disagrees that business awards and favorable customer reviews necessarily demonstrate brand recognition, CCI's officer declarations do support its claims of substantial advertising and sales. A potentially suggestive mark in combination with substantial sales using the mark make this factor weigh in favor of CCI.

**Similarity of protected mark and allegedly infringing mark**. Courts in the Ninth Circuit assess similarity of the protected mark and the allegedly infringing mark by considering (1) similarity of appearance, sound, and meaning; (2) marks in their entirety and as they appear in the marketplace; and (3) weighing similarities more heavily than differences. *Pom Wonderful*, 775, F.3d at 1127–28; *GoTo.com*, 202 F.3d at 1206.

CSCP frames the analysis as between CLEAN CRAWLS and CRAWL SPACE CLEANING PROS. Dkt. 39 at 15–16. CCI argues that "in light of [CSCP's] heavy reliance on the dominant CRAWL and PROS portions of the longer versions of its mark"

and increasing use of the shortened trade name CRAWL PROS, a reasonable factfinder

should consider the shorter version of the mark as well. Dkt. 48 at 25. Herron declares

that CSCP does business as CRAWL PROS, so the Court will evaluate both versions.

Herron Decl. at 1. Visually, CSCP describes its mark as CRAWL SPACE CLEANING

PROS, which "consistently includes the house and leaf design feature, and uses a green

and orange color scheme," and describes CCI's mark as CLEAN CRAWLS, with "[t]he

word 'CLEAN' stacked on top of the word 'CRAWL,' with the 'splat' image to the left

of the literal elements" in blue, grey, and white, arguing that consumers see "very

different marketplace representations of these two marks." Dkt. 39 at 16. CCI argues that

visual similarity exists "in light of [CSCP's] heavy reliance on the dominant CRAWL

and PROS portions of the longer versions of its mark" and that additional visual

similarity exists when CSCP refers to itself as CRAWL PROS. Dkt. 48 at 18, 25. To the

ear, CCI argues that CRAWL PROS and CLEAN CRAWLS sound alike because "both

use CRAWL and both have two syllables." Dkt. 48 at 25. CCI further argues that

CRAWL SPACE CLEANING PROS sounds like CLEAN CRAWLS because both use

the word CLEAN and the word CRAWL. Dkt. 48 at 25. CCI contends that the

importance of word-of-mouth reviews in the context of home services increases the

importance of auditory similarity in this case. Dkt. 48 at 25 (citing *Pintrest, Inc. v.

Pintrips, Inc.*, 140 F. Supp. 3d 997, 1013 (N.D. Cal. 2015) ("Sound is also important

because reputation is often conveyed word-of-mouth."). Cognitively, CSCP argues that

CLEAN CRAWLS and CRAWL SPACE CLEANING PROS refer to different concepts,

a clean space, in contrast with the people who do the cleaning, and are thus cognitively

dissimilar. Dkt. 39 at 15. CCI counters that a reasonable juror "could conclude that both sets of marks call to mind the result of cleaning up a crawl space." Dkt. 48 at 25.

While the Court sees little visual similarity between the marks particularly when incorporating the logos and colors, a reasonable juror could find likely auditory similarity given the repetition of words with similar meaning beginning with a hard 'c' sound, particularly in a word-of-mouth context where a trade name may not be perfectly articulated. Thus, putting more emphasis on similarities, *Pom Wonderful*, 775 F.3d at 1127–28, this factor also weighs in favor of CCI.

**Relatedness of goods or services**. "Related goods are more likely than non-related goods to confuse the public as to the producer of the goods. A diminished standard of similarity is therefore applied when comparing the marks of closely related goods." *Official Airline Guides*, 6. F.3d at 1392. CSCP and CCI do not dispute that they provide related services. Dkt. 39 at 2; Dkt. 48 at 24. Therefore, this factor also makes public confusion more likely.

**Defendant's intent.** While plaintiffs are not obligated to prove wrongful intent to support a finding of trademark infringement, "when the evidence does show or require the inference that another's name was adopted deliberately with a view to obtain some advantage from the good will, good name, and good trade which another has built up, then the inference of the likelihood of confusion is readily drawn." *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 157–58 (9th Cir. 1963). CCI argues that the past relationship of the parties, and CSCP's "blatant copying of [CCI's] forms and [CSCP's] efforts to poach [CCI's] employees" supports an inference that CSCP

intentionally copied CCI's mark with intent to confuse consumers. Dkt. 48 at 27. These facts could support a reasonable juror inference of intent, in contrast to a fact pattern where the two businesses were not known to each other prior to discovery of alleged infringement, but could equally support nothing more than an inference that CSCP sought a name that would help customers identify it.

**Evidence of actual confusion.** "Evidence of actual confusion is strong evidence of likelihood of confusion." *Surfvivor Media, Inc. v. Survivor Productions*, 406 F.3d 625, 633 (9th Cir. 2005). Because actual confusion is difficult to prove, "[t]he failure to prove instances of actual confusion is not dispositive against a trademark plaintiff." *Brookfield*, 174 F.3d at 1050. In *Americana Trading, Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1289 (9th Cir. 1992), the Circuit found testimony by a company's owner about confusion among retailers and a single letter from a misdirected customer "sufficient evidence of actual confusion which, if believed by the trier of fact, would aid [the plaintiff's] infringement claim." In responses to CCI interrogatories, CSCP provided eight specific instances of customer confusion, including six conversations where the customers had had more than cursory interaction, such as an estimate or actual work done, with CCI, and had mistakenly contacted CSCP to follow up. Dkt. 57-1 at 22–23.[6] These instances appear to be strong evidence of exactly the kind of consumer difficulty in

---

[6] CSCP's only evidentiary objection to this question in its interrogatory response was overbreadth. The Court finds nothing to suggest that these records of customer conversations would not be admissible as business records. Fed. R. Evid. 803(6).

"distinguish[ing] among competing producers" that trademark laws seek to address. *Park*

*'N Fly*, 469 U.S. at 198.

**Marketing channels.** "Convergent marketing channels increase the likelihood of confusion." *Nutri/System*, 809 F.2d at 606. The available record supports an inference that the companies market similar services to homeowners in Western Washington using conventional advertising methods, and so use convergent marketing channels.

**Expansion into competing markets**. "The likelihood of expansion in product lines factor is relatively unimportant when two companies already compete to a significant extent." *Brookfield*, 174 F.3d at 1060 (citing *Official Airline Guides*, 6 F.3d at 1394). Here, the parties already compete and have not suggested that expansion into new service lines is at issue.

**Degree of care.** Courts note that consumers exercise less care with inexpensive products, making confusion more likely, *Brookfield*, 174 F.3d at 1060, and greater care when purchasing expensive goods making confusion less likely, *Pom Wonderful*, 775 F.3d at 1127. CCI argues that customers seeking crawl space cleaning "need help—often emergency in nature—to address pest, flooding, or other undesirable problems," and that its products are priced affordably, Dkt. 48 at 26–27, implying that consumers may exercise a lower degree of care when selecting a crawl space cleaning service. CCI also argues that CSCP may be improperly benefiting from 'initial interest confusion,' where an infringing competitor benefits from the mark's goodwill when confused customers survey its offerings, which is actionable as trademark infringement. Dkt. 48 at 27 (citing *Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020, 1025 (9th

Cir. 2004). The Court finds this framing plausible and supported by the instances of customer confusion. *See* Dkt. 57-1 at 22–23.

The *Sleekcraft* test "is a fluid one and the plaintiff need not satisfy every factor, provided that strong showings are made with respect to some of them." *Surfvivor*, 406 F.3d at 632 (citing *Dreamwerks Production Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998)). Finding a strong showing for actual consumer confusion and neutral or positive showings supporting confusion for the other factors, the Court denies summary judgment for CSCP on CCI's claims relating to the CLEAN CRAWLS trade name.

### 2.    The Slogans

CSCP seeks summary judgment on CCI's trademark claims regarding Slogan One on the grounds of priority in usage. CSCP seeks summary judgment on claims regarding Slogan Two on the ground that Slogan Two is confusingly similar to Slogan One, therefore infringing CSCP's rights in Slogan One established by priority in usage. Dkt. 39 at 12.

"[L]ike with trademarks, common law rights are acquired in a service mark by adopting and using the mark in connection with the services rendered." *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1156 (9th Cir. 2001) (citing *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403 (1916)). "To acquire ownership of a trademark, it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Brookfield*, 174 F.3d at 1047 (quoting *Sengoku Works Ltd v. RMC Int'l, Ltd.*,

96 F.3d 1217, 1219 (9th Cir. 1996)). "The first to use a mark is deemed the 'senior' user and has the right to enjoin 'junior' users from using confusingly similar marks in the same industry and market or within the senior user's natural zone of expansion." *Brookfield*, 174 F.3d at 1047. Congress amended the Lanham Act in 1988, changing the statutory definition of use in commerce from a standard where "the extent of actual use of the mark was irrelevant so long as it amounted to more than a mere sham attempt to conform with statutory requirements" to now require "a greater degree of activity," *Chance*, 242 F.3d at 1157 (citing 2 J.T. McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 16:8 (4th ed. 1997)). The Trademark Trial and Appeal Board of the USPTO interpreted the new language to mean that the party claiming ownership of the mark must show "commercial use of the type common to the particular industry in question." *Id.* (citing *Paramount Pictures Corp. v. White*, 31 U.S.P.Q.2d 1768, 1774 (TTAB 1994)).

"For both goods and services, the 'use in commerce' requirement includes (1) an element of actual use, and (2) an element of display." *Chance*, 242 F.3d at 1159. The statutory definition for services requires "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark" and defines use in commerce for services "when [a mark] is used or displayed in the sale or advertising of services and the services are rendered in commerce." 15 U.S.C. § 1127 (2012). The Ninth Circuit directs district courts to weigh the following six factors in evaluating the totality of the circumstances to determine use in commerce:

the genuineness and commercial character of the activity, the determination of whether the mark was sufficiently public to identify or distinguish the marked service in an appropriate segment of the public mind as those of the holder of the mark, the scope of the non-sales activity relative to what would be a commercially reasonable attempt to market the service, the degree of ongoing activity of the holder to conduct the business using the mark, the amount of business transacted, and other similar factors which might distinguish whether a service has actually been "rendered in commerce."

*Chance*, 242 F.3d at 1159. A non-sales activity "still must be sufficiently public in nature to identify or distinguish the goods or services in an appropriate segment of the public mind as belonging to the owner." *Rearden*, 683 F3d at 1206. In applying the test, the court in *Chance* determined that, although the record supported an inference that the plaintiff's use was not a sham, the plaintiff presented no evidence of bona fide sales, and the defendant had been using the mark continuously in advertising and marketing prior to the plaintiff's use, establishing priority. 242 F.3d at 1159–60. While CSCP argues CCI's evidence "at most, again demonstrate mere prepatory intent to use the phrase in conjunction with CCI's services," Dkt. 39 at 21 n.1 (citing *Brookfield*, 174 F.3d at 1052), here, CCI's actual sales and offerings of the service are clear from the record, but the question is whether CCI provides sufficient evidence from which a reasonable juror could conclude CCI actually used the mark prior to 2013.

The parties agree that priority of use is the disputed issue here. *See* Dkt. 39 at 19; Dkt. 48 at 28. CSCP claims use of Slogan One starting in June 2013. Dkt. 39 at 21. CCI's application for registration for Slogan One with the USPTO claims first use and first use in commerce in 2001. Dkt. 57-1 at 51. CCI argues "[t]here is no question as to long-time

Internet usage of [Slogan One] (and its complementary slogan [Slogan Two] since long prior to [CSCP's] adoption of the conflicting mark." Dkt. 48 at 29.

CSCP argues that CCI has "failed to provide any documentary evidence" to support its claim that has used Slogan One throughout the Pacific Northwest since 1993, Dkt. 39 at 21 (citing Dkt. 1, ¶ 16), and argues that because CCI's declarations explain "much of the use of the marks to its customers base [sic] was verbal, corroborating evidence from customers as to this auditory input is essential to CCI's claims," Dkt. 60 at 10. CSCP provides documentation of its use of Slogan One in an advertising graphic, a banner ad, on company cars, business cards, and on magnets, with order dates indicating use between 2013 and 2014, Herron Decl. at 9–25, as well as documentation of additional use on advertising materials, company items, and a registered domain name between 2014 and 2017, *id.* at 26–41.

CCI argues that a court could conclude it has proved priority based on the testimony of one witness, and corroboration of that witness's testimony is considered helpful but not required. Dkt. 48 at 28 (citing *Nettie Rosenstein, Inc. v. Princess Pat, Ltd.*, 220 F.2d 444, 446–47 (C.C.P.A. 1955); *Crystal Entm't & Filmworks, Inc. v. Jurado*, 643 F.3d 1313, 1322 (11th Cir. 2011)). In *Crystal Entertainment,* the Eleventh Circuit explained that "[o]ral testimony, even of a single witness, if 'sufficiently probative,' may suffice to prove priority, but such testimony 'should not be characterized by contradictions, inconsistencies, and indefiniteness'; instead, it 'should carry with it convictions of its accuracy and applicability." 643 F.3d at 1322 (quoting *B.R. Baker Co. v. Lebow Bros.*, 32 C.C.P.A. 1206 (1945)). CCI argues that the declarations of "long-time

company ownership, employees and third parties" are sufficient to establish the use of both Slogan One and Slogan Two well prior to 2013. Dkt. 48 at 29. Also quoting *Crystal Entertainment*, 643 F.3d at 1322, and *B.R. Baker*, 32 C.C.P.A. 1206, CSCP counters that testimony of witnesses or a single witness not accompanied by corroborating evidence "should be closely scrutinized." Dkt. 60 at 8. CSCP points out that despite Henrichsen's claim that CCI has used the slogans in "various written forms" since 2001, CCI was only able to provide two undated pieces of written evidence. Dkt. 60 at 9 (citing Henrichsen Decl at 49).

CCI provides printouts from its website showing its use of Slogan One and Slogan Two, including a photo of Slogan Two on a company truck. Dkt. 49-1 at 55–57, 68. Henrichsen's accompanying declaration explains that CCI has "maintained a website at [www.cleancrawls.com] consistently for most of the company's existence, including prior to 2013." Henrichsen Decl. at 7. Notably, neither Henrichsen's declaration nor the printouts themselves establish when either slogan appeared on the website, or when Slogan Two appeared on the truck.

CCI provides five declarations from its officers and employees attesting to the history of CCI's use of the slogans in commerce. Henrichsen declares that he "first started using the slogans and similar variations with customers throughout the Pacific Northwest" in 1993, and transferred the rights to CCI in 2001. Henrichsen Decl. at 2. He further declares that CCI has "consistently trained our employees to use" the family of marks including CLEAN CRAWLS and Slogans One and Two "when interacting with the public and our customers," and that "I have personally used or observed the family of

marks used with the public to indicate the source of [CCI] services literally thousands of times prior to 2013." *Id.* Finally, he declares that "[w]hile use of the marks has taken various written forms over the years, including business cards, brochures, flyers, advertisements and the Internet, the vast majority of our advertising and customer association comes verbally from our sales teams and work crews" who use the family of marks "and similar slogan variations with customers on a daily basis." *Id.* at 2–3. Gjerness declares that he has "personally observed the family of marks used by others at [CCI] since at least as early as 2009" and has "personally used or observed the family of marks used with the public to indicate the source of [CCI] services literally thousands of times prior to 2013." Gjerness Decl. at 2. Patrick J. Smith, an estimator at CCI since 2008, declares that "[t]hroughout my time with [CCI], I personally used and observed from others at the company using the following family of trademarks" which includes the Slogans. Smith Decl. at 1. Robin Compton and Tammy Wilen, CCI employees since 2009, make the same declaration. Dkt. 53, Declaration of Robin Compton, at 1; Dkt. 54, Declaration of Tammy Wilen, at 1.

CSCP argues that CCI offers two declarations "from witnesses who have not been previously disclosed" and so may not be considered per Fed. R. Civ. P. 37(c)(1). Dkt. 60 at 12. CSCP separately refers to the declarations of CCI's officers and employees and to the challenged witnesses, leading the Court to infer that CSCP believes Steve Bodine and Ken Harris of Bodine Construction are the undisclosed witnesses. *See* Dkt. 60 at 11–12; Dkt. 55, Declaration of Steve Bodine; Dkt. 56, Declaration of Ken Harris.

Even if the Court disregards these last two declarations, upon consideration of the remainder of the record presented, the Court concludes that there is sufficient evidence from which a reasonable juror could conclude CCI has priority of use in Slogan One. CSCP does not argue that verbal use of a slogan with customers in home cleaning services can never be "commercial use of the type common to the particular industry in question," *Chance*, 242 F.3d at 1157 (citing *Paramount Pictures*, 31 U.S.P.Q.2d at 1774), only that testimony verifying that use is self-serving and has little probative value as to the understanding of the consuming public. Dkt. 60 at 10, 10 n.47 (citing *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 910 (9th Cir. 1995)). Though the declarations are not particularly detailed and contain similar or identical language, CCI presents five employees with a history of employment starting at least three years before 2013, who could potentially testify as to CCI's regular use of the Slogans with customers so as to "identify [the] . . . services in an appropriate segment of the public mind as belonging to the owner." *Rearden*, 683 F3d at 1206. Henrichsen declares that CCI has made 40,000 sales between 2010 and present, based on an average of more than 8,000 leads per year. Henrichsen Decl. at 6–7. CSCP does not contest this sales data. Combining substantial sales with declarations attesting to regular use of the Slogans in the context of those sales and construing all evidence in favor of CCI, the Court finds CCI has met its burden to raise a question of material fact as to priority of use.

Regarding Slogan Two, CSCP argues that CCI "cannot establish that [CSCP] has made commercial use of [Slogan Two] because it hasn't." Dkt. 39 at 22. In the

alternative, CSCP argues that if CCI believes Slogan Two is confusingly similar to Slogan One, then Slogan Two would be unprotectable based on CSCP's priority of use in Slogan One. Dkt. 39 at 22. The Court finds a dispute of material fact exists as to ownership of Slogan One, and the resolution of ownership of Slogan One may drive the resolution of ownership of Slogan Two. CSCP is correct that if it won at trial on its claim of priority for Slogan One, it is possible that the jury could also conclude CCI's claims regarding Slogan Two are invalid because it is confusingly similar to Slogan One. Conversely, if CCI won at trial on its claim of priority for Slogan One, a jury could conclude that CSCP's use of Slogan One infringes CCI's rights in both Slogan One and Slogan Two, without CCI's having to prove CSCP used Slogan Two, due to confusing similarity.

Finally, CSCP argues that all of CCI's trademark claims are barred by laches, reading the Henrichsen and Gjerness declarations to "state that they have known of [CSCP's] alleged trademark infringement since 2012." Dkt. 60 at 10–11 (citing Henrichsen Decl. at 4; Gjerness Decl. at 3). The Court agrees with CCI that CSCP's argument "is based on a misreading of the declarations submitted." *See* Dkt. 61 at 2. Both declarations state that Herron and Pullen were exposed to CCI's trademarks starting in 2012, not that CCI was aware of use by CSCP of the trademarks at that time. Henrichsen Decl. at 4; Gjerness Decl. at 3. On this issue, there is also a dispute of a material fact.

Therefore, the Court denies summary judgment for CSCP on CCI's claims of trademark infringement for both Slogan One and Slogan Two.

## C. Copyright claims

CCI alleges that CSCP has deliberately copied and used five of CCI's works of authorship named in pending federal copyright applications. Dkt. 1, ¶¶ 12, 23. The works are (1) CCI's Project Graph, (2) CCI's Project Bid Sheet, (3) CCI's Project Worksheet, (4) Clean Crawls Standards, and (5) CCI's Venting Calculator. *Id.* Plaintiffs alleging copyright infringement must demonstrate: "(1) ownership of a valid copyright and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 361 (1991) ("*Feist*").

If the first prong, ownership, is in question, there are five additional elements to consider: "(1) originality in the author; (2) copyrightability of the subject matter; (3) citizenship status of the author, such as to permit a claim of copyright; (4) compliance with applicable statutory formalities; and (4) (if the plaintiff is not the author) a transfer of rights or other relationship between the author and the plaintiff so as to constitute the plaintiff the valid copyright claimant." *Advanz Behavioral Mgmt. Res., Inc. v. Miraflor*, 21 F.Supp.2d 1179, 1183 (C.D. Cal. 1998) ("*Advanz*") (citing 4 Nimmer on Copyright § 13.01(A) (1997)). If the second prong, copying, is at issue but the plaintiff does not have evidence of direct copying, they can show "the defendant had 'access' to the plaintiff's work and that the two works are 'substantially similar.'" *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1076 (9th Cir. 1990).

Here, CSCP challenges a sub-element of ownership, copyrightability of the subject matter, for the Project Graph, Project Bid Sheet, and Project Worksheet. CSCP argues these works are blank forms not permitted copyright protection under 27 C.F.R. §

202.1(c). Dkt. 39 at 9. CSCP concedes that "the existence of CCI's certificates of registration for [the works] create[s] a rebuttable presumption that the works at issue contain copyrightable subject matter" and CSCP "has the burden of persuasion" to rebut the presumption. Dkt. 39 at 8 (citing *Bibbero Sys., Inc. v. Colwell Sys., Inc*, 893 F.2d 1104, 1106 (9th Cir. 1990) ("*Bibbero*")). [7]

CCI quotes *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 913 (9th Cir. 2010), for the proposition that the Court should first analyze the "extrinsic/intrinsic" distinction between "permissible lifting of ideas and impermissible copying of expression" to evaluate which shared elements of the works are protectable, and how broad the protection should be for an infringed work. Dkt. 48 at 10. However, this analysis assumes protectable content exists. The court in *Mattel* proceeded on an assumption that Mattel owned the preliminary drawings and doll sculpture at issue, and moved immediately to consider how far the copyright of the doll idea's "particular expression" would extend. *Mattel*, 616 F.3d at 913. CSCP is correct that courts end their inquiry once they have determined an allegedly infringed work is a blank form, not copyrightable, and not available as a the basis of a copyright infringement claim. *See* Dkt. 60 at 2 & n.2 (citing

_____

[7] CSCP does not address 47 U.S.C.A. § 410(c), which provides "[i]n any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court," even though Henrichsen declares that the documents were substantially completed in the form registered in 2008–09, Henrichsen Decl. at 5, but copyright registration did not take place until 2017, *see* Henrichsen Decl. Exs. A–E. Construing all facts in favor of the non-moving party, the Court will follow CSCP's acceptance of the burden to rebut the presumption that the works contain copyrightable subject matter.

*Advanz*, 21 F.Supp.2d at 1182; *Moore v. Kroger Co.*, No. C–13–04171 DMR, 2014 WL 825428, at *5 (N.D. Cal. Feb. 28, 2014)). Therefore, the Court will first analyze CSCP's claims that the first three works are unprotectable under the blank forms rule, then analyze CSCP's claims about the other two works.

### 1. Blank Forms

"Blank forms, such as time cards, graph paper, account books, diaries, bank checks, scorecards, address books, report forms, order forms, and the like, which are designed for recording information and do not in themselves convey information" are material not subject to copyright under 37 C.F.R. § 202.1(c). "A blank form that merely contains words, short phrases, or a *de minimis* amount of text does not satisfy [the requirement for authorship] because it does not qualify as a literary work, a pictorial work, a graphic work, or any of the other categories of works listed in [17 U.S.C. §] 102(a)." 11 Nimmer on Copyright 313 (2018) (citing Registration of Claims to Copyright, 77 Fed. Reg. 37,605, 37,607 (June 22, 2012)). In the Ninth Circuit's interpretation of the rule, a blank form's inclusion of some categories of information and not others does not make it copyrightable, nor does the fact that "considerable effort and creativity went into designing it" necessarily make it copyrightable. *Bibbero*, 893 F.2d at 1107, 1108 n.1. Though the rule has been criticized, the Circuit noted that the Copyright Office considered many comments arguing for the creativity and effort of blank form design in 1980 when it considered abolishing the rule, and "nevertheless chose to reaffirm the validity of the rule." *Bibbero*, 893 F.2d at 1108 n.1 (citing Noting of

Termination of Inquiry Regarding Blank Forms, 45 Fed. Reg. 63,297, 63,299 (September 24, 1980)).

**Project Graph.** CCI's Certificate of Registration with the U.S. Copyright Office for the "Project Graph" identifies a "compilation of text and illustrations." Dkt. 49-1 at 2. The Project Graph document consists of a sheet of graph paper with the "Project Graph" heading, labeled spaces at the top for "Customer Name," "Customer Service Rep." and "North Heading," and at the bottom, a series of boxes to identify features of the house, images of different rodents, and a list of tasks which a CCI employee may need to complete in the home, from A, Re-Screen Vent (Crawlspace) through O, Roof Ridge Line/Roof Cap. *Id*. The CCI and CSCP documents are virtually identical except for a portion of the bottom section identifying features of the house, which has slightly different language, symbols, and categories. *Compare* Dkt. 49-1 at 2, *with* Dkt. 57-1 at 29–30.

In *Bibbero*, the panel considered 'superbills,' medical insurance claim forms with "lengthy checklists" of diagnoses, services performed, and fees which came pre-filled with diagnoses and services common to different specialties, or could be customized by the medical provider. 893 F.2d at 1105–06. Though the forms contained "simple clauses assigning insurance benefits to the doctor and authorizing release of patient information" as well as instructions for completion, the panel held that the superbills were uncopyrightable blank forms which did not convey information prior to their completion by the medical provider. *Id*. at 1105, 1107–08. The panel found the superbills ineligible for the 'text with forms' exception to the blank forms rule, in contrast to *Edwin K.*

*Williams & Co., Inc., v. Edwin K. Williams & Co., East*, 542 F.2d 1053, 1060–61 (9th Cir. 1976) ("*Williams*"), where the account books contained "several pages of instructions on the use of the forms and advice on the successful management of a service station" and *Continental Casualty Co. v. Beardsley*, 253 F.2d 702, 704 (2nd Cir. 1958)), which addressed forms containing inseparable instructions. *Id*. at 1107, 1108. CCI cites *Williams* and *Continental Casualty* in arguing the Project Graph should be eligible for the 'text with forms' exception, as well as *Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1347 (5th Cir. 1994) (user interface coveys information to user), and *Pallen Martial Arts, LLC v. Shir Martial Arts, LLC*, 2014 U.S. Dist. LEXIS 71574 (N.D. Cal. 2014) (forms for new students in martial arts classes conveyed detailed information about conduct in martial arts studio). Dkt. 48 at 14.

CCI argues that it "chose to bring together a variety of symbols and pictures in order to direct the user of the form" including terms and phrases unique to the industry, characterizing its design as conveying potential problem areas, and teaching or guiding the user to some degree. Dkt. 48 at 13–14. However, conveying potential problem areas with industry-specific terms seems to parallel what a superbill did for each medical specialty in *Bibbero*; CCI does not explain what its form teaches the user, whether that be the technician or the customer, and the form's instructions appear similar to or less complex than a superbill's clauses assigning insurance benefits or releasing patient medical information, 893 F.2d 1104, 1107, and not approaching the complexity of *Williams*'s advice on business management, 542 F.2d at 1060–61. CCI also does not explain what the rodent images convey, and whether the recipient of that message is the

CCI technician or the customer receiving the bid. While *Bibbero*'s strong articulation of the blank forms rule has been criticized, as noted in *Advanz*, district courts have continued to apply it. *See, e.g., Advanz*, 21 F.Supp. 2d at 1189; *Calyx Technologies, Inc. v. Ellie Mae, Inc.,* No. 04–cv–1640 SI, 2005 WL 2036918, at *4 (N.D. Cal. Aug 22, 2005); *Moore*, 2014 WL 825428 at *3–4.

CCI cites *Kregos v. AP*, 937 F.2d 700, 703 (2d Cir. 1991) ("*Kregos*") for the proposition that its color choices, layout, and phrases constitute a copyrightable compilation. Dkt. 48 at 13. In *Kregos*, the Second Circuit found the creator's choice of a particular selection of nine categories of baseball statistics into a form demonstrated sufficient originality to be eligible for copyright protection. 937 F.2d at 705. That case illustrates the disagreement about the breadth of the blank forms rule. There, the Second Circuit highlighted *Bibbero* as an example of a case with statements "suggesting broadly that no blank forms are copyrightable," in contrast with cases in district courts and the Third Circuit which have "recognized that there can be protectable elements of forms that include considerable blank space." *Id.* at 708 (internal citations omitted). In contrast to *Kregos*'s recognition that a choice of a particular selection of fillable statistical categories was copyrightable, *Bibbero* reasons that recognizing a form's inclusion of some categories of information and not others, "thus indicating which information was important" as sufficient for copyright protection creates an unadministrable line and "cannot be what the Copyright Office intended by the statement 'convey information' in 37 C.F.R. 202.1(c)." 893 F.2d at 1107.

Even if the *Kregos* analysis was controlling, CCI does not provide examples of the variety of alternative categories that a home maintenance provider could consider, or explain that the tasks it selected are an original and instructive selection. While the form does provide a good method for recording the required information, CCI does not explain how they have selected only a limited array of tasks in order to confine their employees to that limited universe, direct them away from less desirable methods of addressing the maintenance tasks in cleaning crawl spaces, or help them communicate CCI's expertise to customers. On the briefing presented, CCI has simply listed the tasks a crawl space cleaning company would complete, along with a space to record the employee's selection of tasks and data gathered from the home, which does not appear to meet the threshold for guiding the user or integrated instructions necessary to escape the blank form rule. The district court in *Advanz* explained "Plaintiff's forms may be good ones, they may have required thought and work to create, and they may contain some original material or some original organization of unoriginal material, but under the restrictive approach adopted by the Ninth Circuit in *Bibbero Systems*, they are not copyrightable subject matter." 21 F.Supp.2d at 1190. The Court believes CSCP has a strong case for summary judgment on CCI's copyright claims for the Project Graph. However, the Court is requesting additional briefing on other copyright claims as discussed below, and so also requests additional briefing addressing the weaknesses of CCI's claims for the Project Graph identified in this section.

**Project Bid Sheet.** CCI's Certificate of Registration with the U.S. Copyright Office identifies the "Project Bid Sheet" as containing author-created text. Dkt. 49-1 at

5–8. The first page contains spaces to fill in customer information and the tasks to be completed along with their costs, statements, recommendations, and disclaimers to the customer, and spaces for signature. *Id.* at 5. The second and third pages include the 'General Conditions' of the contract between CCI and the customer. *Id.* at 7–8. CCI argues that the Bid Sheet "contains detailed instructions, information, and recommendations to the individuals who participate in completing it," highlighting the signing statement on the first page which establishes terms and conditions, authorizes work performed, and includes cancellation provisions. Dkt. 48 at 15 (citing DKt. 49-1 at 6.

CCI argues that "[i]t is well-settled that legal forms, if original, may properly be the subject of copyright protection" citing *Merritt Forbes & Co. v. Newman Inv. Sec., Inc.*, 604 F. Supp. 943, 950–51 (S.D.N.Y. 1985). Dkt. 48 at 12. Compilations also may be protected under copyright, but the copyright "extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work." 17 U.S.C.A. §103(b). CSCP concedes that the Project Bid Sheet includes literary elements but argues these elements "simply request information that is provided to CCI employees by potential customers, or obtained by CCI employee review, or provided to the customer to allow him or her to decide whether to engage CCI." Dkt. 39 at 10.

The Court's concern is that CCI has not identified which aspects of the text within the Bid Sheet are actually original and thus protectable. "To qualify for copyright protection, a work must be original to the author," meaning "independently created by the author." *Feist*, 499 U.S. at 345. The Court cannot evaluate CCI's claims for infringement

of copyrighted text without clear identification of the specific elements of the work CCI

claims are protected by its certificate of copyright—the specific elements CCI

independently created. CCI highlights text in its signing statement that it argues is

substantially similar to CSCP's signing statement, and identifies five paragraphs of the

ten-paragraph General Conditions page which "use nearly identical legal conditions

expressed in nearly identical ways" but does not argue it independently created the text in

these paragraphs, or detail specific drafting choices made "because of the particular

circumstances surrounding the . . . industry" as the plaintiff did in *Phoenix Renovation*

*Corp. v. Rodriguez*, 439 F. Supp. 2d 510, 516–17 (E.D. Va. 2006). For example, the

Court questions whether CCI is making a claim of independent authorship for one of the

paragraphs identified, Paragraph Eight of the General Conditions titled "Time Limit for

Filing Any Claim," which reads "All claims by either party concerning the performance

of this contract, including but not limited to claims for breach of contract, breach of

warranty, and indemnification, are WAIVED unless filed in a court of competent

jurisdiction with four (4) months of the expiration of the one-year warranty period." Dkt.

49-1 at 7.

The Court requests additional briefing clarifying which aspects of the Project Bid

Sheet CCI claims are original and thus protectable, and any specific contrary showings

from CSCP.

**Project Worksheet.** CCI's Certificate of Registration with the U.S. Copyright

Office identifies the "Project Worksheet" as containing an author-created compilation of

text. Dkt. 49-1 at 10–11. It consists of a single sheet with a detailed array of labeled

spaces to be checked or filled in, as well as an instruction at the top in white text within a red field stating "Red lettering notes what tasks require additional information (i.e. detailed notes and/or location indicated on Project Graph)." *Id.* at 11. CCI characterizes it as containing a set of data CCI specifically chose to gather. Dkt. 48 at 16 (citing *Kregos*, 937 F.2d at 704). However, as noted, *Kregos* suggests a disagreement between Circuits with *Bibbero*, and this form does not teach the user, provide information, or include more than the single line of instruction. *Bibbero*'s bright line, that conveying information cannot be established by containing "some of the possible categories of information but not others," 893 F.2d at 1107, would be directly violated by recognizing the Project Worksheet as conveying information. Like the Project Graph, CCI has failed to create a question of material fact about whether the Project Worksheet contains copyrightable subject matter. If the work contains no copyrightable subject matter, there is nothing to copy or infringe. Therefore, the Court grants summary judgment for CSCP on CCI's copyright claims regarding the Project Worksheet.

## 2. Standards

CCI's Standards document is a set of instructions for employees who clean crawl spaces. DKt. 49-1 at 13–32. CSCP argues it does not have a Standards document and CCI cannot identify an infringing document, so CCI's claim that CSCP has copied its Standards document is moot. Dkt. 39 at 11. CCI argues that because discovery was not complete, it was still possible that an infringing CSCP Standards document could be discovered. Dkt. 48 at 18. Fed. R. Civ. P. 56(d) authorizes district courts to defer considering a motion for summary judgment or deny it if "a nonmovant shows by

affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition . . ." The party seeking a Rule 56(d) continuance bears the burden of proffering facts sufficient to satisfy the requirements of 56(d). *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 921 (9th Cir. 1996).

CCI did not move for a Rule 56(d) continuance, and has not presented any affidavit or other proof that the alleged infringing document exists, arguing only that CSCP "had access to and copied" the four other works, implying that it is thus likely CSCP copied this work as well. Dkt. 48 at 18. This is mere speculation. Because CCI fails to present any specific, probative evidence to support its claim, *Matsushita Elec.*, 475 U.S. at 586, the Court grants summary judgment for CSCP on CCI's copyright claims regarding the Standards document.

### 3.    Venting Calculator

CCI's Certificate of Registration with the U.S. Copyright Office identifies the "Venting Calculator" as containing a "compilation of text and equations." Dkt. 49-1 at 34–36. The Venting Calculator consists of two pages, the first containing colored boxes and simple instructions for the user to input figures to calculate the appropriate venting in different areas of a home, and the second containing a table of venting data. *Id.*

CSCP argues the Venting Calculator document "simply provide[s] the procedure by which the facts of a given house dictate the work that both CCI and [CSCP] perform," arguing that the copyright covers "calculations that all attic and crawl space service providers must follow." Dkt. 39 at 11. CSCP cites *Feist*, 499 U.S. at 347, for the proposition that facts are not copyrightable, and 17 U.S.C § 102(b) for the point that

copyright protection does not cover "any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." Dkt. 39 at 12. However, as the Ninth Circuit explained in *Cash Dividend Check Corp. v. Davis*, 247 F.2d 458, 460 (9th Cir. 1957) ("*Cash Dividend*") it is possible for an "integrated subject of the copyright" to be more than the utilitarian item that is one component of the subject when it "conveys to the public information through appellant's authorship," there, a stamp savings plan. In *Cash Dividend*, the appellant did not attempt to copyright its system or the check portion of the work on its own, but "[r]ather, it seeks a copyright over the writing, with the integrated check, which describes the means by which the stamp-check plan is carried out." *Id*. at 460.

CCI explains that its creativity "is expressed in the collection of color choices, layout, and phrases used at least on the first page of the Venting Calculation form." Dkt. 48 at 17. CCI does not argue that its color choices and layout convey information, even though copyright protects forms that convey information, 37 C.F.R. § 202.1(c), and does not protect "any functional layout, coloring, or design that facilitates the use of a form." 11 Nimmer on Copyright 313 (2018) (citing *Baker v. Selden*, 101 U.S. 99 (1879)).

While "the copyright in a factual compilation is thin," and a "subsequent compiler remains free to use the facts contained in another's publication to aid in preparing a competing work, so long as the competing work does not feature the same selection and arrangement," CCI could make the case that it conveys something original in its visual illustration of calculations using factual information. As noted above, enforcing a valid

copyright requires identifying precisely what was "independently created by the author." *Feist*, 499 U.S. at 345, 349. The Court requests additional briefing which outlines the differences, if any, between the factual calculations involved in determining the number of vents a service provider would install in a home, and the information conveyed by specific color choices and layout in the document. *See Cash Dividend*, 247 F.2d at 460.

The second page of each company's Venting Calculation document appears to be a table of data. *See Feist*, 499 U.S. at 344, 348 ("Others may copy the underlying facts from the publication, but not the precise words used to present them.") CCI admits as much, arguing that its creativity is expressed on "at least the first page" of the Calculator. Dkt. 48 at 17. CCI explains that the colorful page of the Calculator "was authored by [CCI] and ***not*** provided by the local public utility districts," but does not explain the source of the black-and-white page. *Id.* Thus, the Court expects that supplemental briefing will also clarify the origin and originality or lack thereof of this data.

Finally, finding CCI has not conclusively established any of the works at issue contain protectable content, the Court does not analyze the extent of the protection for the content under *Mattel*. 616 F.3d at 913.

## III. ORDER

Therefore, it is hereby ordered that CSCP's motion for summary judgment, Dkt. 39, is **DENIED** as to CCI's trademark claims, and **GRANTED** as to CCI's copyright claims for the Project Worksheet, and Standards documents. The Court reserves ruling and requests simultaneous supplemental briefing on CCI's copyright claims for the Project Graph, Project Bid Sheet and Venting Calculations documents. Opening briefs

1  shall be no longer than 12 pages and be filed no later than February 15th, 2019, and

2  response briefs shall be no longer than 8 pages and be filed no later than February 22nd,

3  2019.  The Clerk shall renote CSCP's motion for consideration on the Court's February

4  22nd, 2019 calendar.

5  　　　　Dated this 29th day of January, 2019.

6

7

8  　　　　　　　　　　　　　　　BENJAMIN H. SETTLE
   　　　　　　　　　　　　　　　United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22