UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| CLEAN CRAWL, INC., <br><br>                      Plaintiff, <br><br>     v. <br><br> CRAWL SPACE CLEANING PROS, INC., <br><br>                   Defendant. | CASE NO. C17-1340 BHS <br><br> ORDER DENYING DEFENDANT'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S MOTION FOR LEAVE TO FILE DECLARATION |

      This matter comes before the Court on Defendant Crawl Space Cleaning Pros'

(CSCP) second motion for partial summary judgment, Dkt. 120, and Plaintiff Clean

Crawl, Inc's ("CCI") motion for leave to file declaration of Charles E. Henrichsen

("Second Henrichsen Decl."), Dkt. 129. The Court has considered the pleadings filed in

support of and in opposition to the motions and the remainder of the file and hereby

denies the motion for summary judgment and grants the motion for leave to file

declaration for the reasons stated herein.

# I. PROCEDURAL HISTORY AND FACTUAL BACKGROUND

This suit arises from copyright and trademark disputes between CCI and CSCP, two businesses which clean attic and crawl spaces and provide pest exclusion services for homes in the Western Washington area.

CCI began doing business in its current iteration in 2001 when its president, Charles Henrichsen ("Henrichsen"), transferred his Bio Bug Pest Management, Inc. business to CCI, Dkt. 48 at 6, and began using the trade name Clean Crawls, Dkt. 49, Declaration of Charles Henrichsen ("Henrichsen Decl.") at 3. CCI is headquartered in Marysville, Washington. Dkt. 1, ¶ 2. CSCP began operations on January 9, 2013, under founder and owner Richard Herron ("Herron"). Dkt. 39 (citing Dkt. 40, Declaration of Richard Herron ("Herron Decl."), at 1). Henrichsen and Herron had met each other in 2008, and Henrichsen declares that he mentored Herron in starting a business, Sustainable Building and Insulation ("SBI"). Henrichsen Decl. at 3–4. Henrichsen declares that he made SBI a CCI subcontractor, and one of his employees, CCI sales representative Jared Pullen ("Pullen"), referred "many jobs" to SBI. *Id*. at 4. Henrichsen declares that these referrals allowed Pullen and Herron to be "heavily exposed" to CCI's "family of trademarks and copyrights" between 2010 and 2013. *Id.* Henrichsen also declares that all of CCI's copyrighted materials at issue "were substantially completed in the form registered in the 2008-2009 time frame." *Id.* at 5.

Henrichsen specifically declares that by 2012, Herron and Pullen "knew and had used repeatedly in association with [CCI] its family of trademarks," including the CLEAN CRAWLS trade name, WE GO WHERE YOU DON'T WANT TO ("Slogan

One"), and WE DO THE WORK YOU DON'T WANT TO ("Slogan Two") (collectively "the family of marks"). Henrichsen Decl. at 4. Henrichsen declares that CCI has used the Clean Crawls trade name, Slogan One, and Slogan Two "and similar slogan variations with customers on a daily basis, and have for more than 15 years throughout the Pacific Northwest," but typically has not used its slogans in printed advertising or on company vehicles or other items, "instead using them primarily on the Internet and verbally with customers, associates, and the public." *Id.* 2–3, 6, 7. Henrichsen and others at CCI declare that CCI has used the Slogans extensively dating back to at least 2010. *See, e.g.* Henrichsen Decl. at 4; Dkt. 50 Declaration of Vice President of CCI Dale Gjerness ("Gjerness Decl.") at 4–5; Dkt. 52, Declaration of Patrick J. Smith ("Smith Decl."), at 1.

**A.    2013**

Herron testified as CSCP's corporate representative that CSCP acquired the CrawlPros.com domain name "either in the end of 2012 or the beginning of 2013." Dkt. 121, Ex. 2 at 211. CSCP began operations at a single location in Tacoma in early 2013. Herron declares that it used Slogan One extensively to brand its business. *See* Herron Decl. at 6–41; Dkt. 120 at 2. Herron testified as CSCP's corporate representative that an employee named Paul came up with Slogan One in "April, May, around that time frame, in 2013" as Paul was finishing out his time with CSCP before moving to Australia. Dkt. 121 at 79–80.

CCI Vice President Dale Gjerness testified that he became aware of CSCP's existence by "2014, 2013, somewhere in there." Dkt. 123, Ex. 1 at 49. CCI General Manager Andrew Gjerness testified as CCI's corporate representative that CCI first

became aware that CSCP used the name Crawl Space Cleaning Pros "sometime in mid-2013, around the summer," because salesmen "down in that area" including Pullen and Henrichsen heard that Herron had started a new company and was operating under that name. Dkt. 121, Ex. 2 at 11.

In 2013, CSCP placed Slogan One in advertising including an Angie's list ad, on company cars and trucks, and on its company headquarters. Herron Decl. at 6–24. CSCP opened its second location in Everett, Washington sometime between 2013 and 2016. Dkt. 120 at 2 & n.6 (citing Dkt. 119, Ex. A at 131).[1] Between 2013 and 2019, Herron testified, CCI and CSCP would have both been required to have industry representatives present at annual meetings for three utility companies—Tacoma Power, Puget Sound Energy, and Snohomish County Public Utility District. Dkt. 121, Ex. 5 at 64. Henrichsen testified that he saw Herron at Tacoma Power and Puget Sound Energy meetings. Dkt. 121, Ex. 4 at 86. Herron also testified that during that span "[t]here could be times at the Seattle Home Show where [CCI does] show up and have a booth that [CSCP] would have a booth too." *Id*. Henrichsen testified that the Seattle Home Show occurs twice a year but

---

[1] Dkt. 119 is filed under seal. Ex. A contains the material referenced in Dkt. 121, Ex. 1, and Ex. B contains the material referenced in Dkt. 121, Ex. 8. CSCP's motion states that CSCP opened its second location in Everett, Washington in 2013. Dkt. 120 at 2. The underlying citation, filed under seal, shows that when Herron as CSCP's corporate representative was asked at deposition in 2019 when CSCP moved to Everett, he replied "[t]hat would have been two and a half years ago." Dkt. 119, Ex. A at 131. CCI also argues that CSCP expanded to Everett in 2016. Dkt. 122 at 5. The Court also notes that though the referenced portion of Herron's 30(b)(6) deposition was submitted under seal, the Court finds no reason to redact this information in this order. If a party disagrees with this conclusion, it may file a motion to seal this portion of this order.

CCI "didn't always do it twice a year. Most of the time we did it, but not always." Dkt. 121, Ex. 4 at 76.

**B.    2014**

Herron testified as CCI's corporate representative that in Spring 2014, he was at the Seattle Home Show at CSCP's booth, and Henrichsen came by the booth. Dkt. 121, Ex. 2 at 64. Herron testified that Henrichsen looked at a banner on the booth which featured Slogan One, read Slogan One out loud to Herron, and told Herron "[t]hat's a great slogan, Richard." *Id*. Herron testified that the spring Home Show was usually held in March or April. *Id*. at 65. Henrichsen testified that his guess was the first time he saw CSCP at the show was in 2013 or 2014, "[s]omewhere around the time" that CSCP started and testified that he would see CSCP's banners. Dkt. 121, Ex. 4 at 76–77. When asked in deposition if he ever complimented Herron on his booth, Henrichsen replied "Maybe." Dkt. 121, Ex. 4 at 78. Henrichsen declared that he never saw Slogan One at the Home Show and declared that if he had, he would have complained about it. Dkt. 122 at 5 (citing Second Henrichsen Decl., P 3). Henrichsen also declared that he never complimented Herron on CSCP's use of Slogan One. *Id*. (citing Second Henrichsen Decl., P 4).

In 2014, according to Herron's testimony, he was approached by Pullen at an industry show. Dkt. 121, Ex. 5 at 55–56.[2] Pullen told Herron he had planned to leave CCI to start his own business but that plan had failed and CCI had reassigned his territory, so

---

[2] In response to interrogatory, CCI stated that Pullen and the other employees left in 2013. Dkt. 121, Ex. 9 at 7.

he was interested in a position with CSCP. *Id*. Herron conducted two interviews with

Pullen "probably in February or March of 2014" and then hired him as CSCP's sales

manager "in 2014." *Id*. at 56. Pullen worked for CSCP "for approximately six months

before [CCI] hired him back." *Id*. at 56–57. Herron testified that at an unspecified point,

Henrichsen told him he "could use [CCI's Project Graph] to create my own graph as long

as [Herron] changed it up some." Dkt. 127 at 88–89.[3] Herron as CSCP's corporate

representative testified that Pullen created CSCP's venting calculator. Dkt. 119 at 184–

85.[4]

Henrichsen testified that approximately fifteen employees left CCI around the time

Pullen left and when they came back some three weeks later, told him they had been

working at CSCP. Dkt. 121, Ex. 4 at 71. He declared that this episode constituted "a

major disruption to our business in the southern branch." Henrichsen Decl. at 5. Herron

testified as CSCP's corporate representative that "somewhere around March, April" of

2014, fifteen CCI employees came to CSCP seeking employment because CCI reduced

their commissions and he hired three of them. Dkt. 119 at 168–69.[5] Herron also testified

---

[3] Dkt. 127 contains additional pages of Herron's deposition inadvertently omitted from Dkt. 121, Ex. 5. The Court's pincites for Dkt. 127 are to the page numbers of Herron's deposition transcript.

[4] Although this information was submitted under seal, the Court finds no reason to redact this information in this order. If a party disagrees with this conclusion, it may file a motion to seal this portion of this order.

[5] *See* footnote 4.

that during a conversation after a Tacoma Power annual meeting, Henrichsen told him that most of these employees returned to CCI. Dkt. 119 at 169.[6]

Henrichsen testified that when Pullen returned to CCI as an employee, he told Henrichsen that CSCP had copied CCI's "project worksheet, bid sheet, the venting calculator and the project graph." Dkt. 121, Ex. 4 at 114. Henrichsen testified that other salesmen had also told him about the copying, but he did not know if it was before or after Pullen returned as an employee. *Id*. at 114–15. Henrichsen testified that a particular salesman, Jeff Young, told him "[a] couple of years ago, maybe" that CSCP copied CCI's project worksheet. *Id*. at 116. In response to a series of questions about which salesmen had notified him about copying of particular documents, Henrichsen confirmed these conversations had all occurred a couple of years ago. *Id*. at 117. Henrichsen testified that he did not discuss this copying with Herron when he learned of it because he prefers to "just focus on my own business and move ahead, that's why. I try to ignore the competition and do what I need to do to take care of my employees and my customers." *Id*.

## C. 2014–2016

Herron, as CCI's corporate representative, testified that between 2014 and 2015 Henrichsen was president of the Washington Weatherization Association ("WWA"). Dkt. 121, Ex. 5 at 64.[7] Henrichsen testified this was "an association of your insulation

---

[6] *See* footnote 4.

[7] CSCP submits a printout of an internet search for Henrichsen's LinkedIn profile, which lists under "Organizations" that Henrichsen was president of the Washington Weatherization Association starting in March 2014. Dkt. 121, Ex. 10.

contractors" which he joined "because every business owner wants to be able to share and try to help each other out to grow a business." Dkt. 121, Ex. 4 at 36. When asked if he had conversations with Herron about CSCP after CSCP began operations, Henrichsen testified "we would run into each other when I was on the way out from the Weatherization Association." Dkt. 121, Ex. 4 at 85.

Andrew Gjerness as CCI's corporate representative testified that CCI first "heard stuff" in 2015 or 2016 on the topic of CSCP's using CCI's Project Graph. Dkt. 123, Ex. 3 at 42. He testified that Henrichsen "might have heard a rumor or two, but he thought nothing of it, that they were using our stuff." *Id*.

Between 2014 and 2017, CSCP expanded its use of Slogan One to include business cards, customer giveaways, a domain name, advertising, its payment authorization form, and company jackets. Herron Decl. at 25–41. In late 2016, CSCP opened a third location in Marysville, Washington. Dkt. 120 at 2.

When asked if he had ever seen CSCP's advertising prior to March 2017, Dale Gjerness testified "I may have seen a truck going down the freeway or so, but not looking at the website, nothing." Dkt. 121, Ex. 6 at 76. He also testified that at a meeting at some point prior to March 2017 he saw a CSCP employee wearing "either a green jacket or a green shirt - - and it said Crawl Pros - - it must have been Crawl Space Cleaning Pros." *Id*. at 77.

**D.    2017**

On March 20, 2017, CSCP applied to register Slogan One in Washington as a trademark in class 37, registering it for use with "[c]leanup of crawl spaces and attics and

insulation installation services." Dkt. 41, Declaration of Emilia L. Sweeney ("Sweeney Decl.") at 5–14. Also in March 2017, Herron declares that CSCP "learned that CCI had begun using [Slogan One] on CCI's website," and so asked CCI to cease and desist. Herron Decl. at 3–4. Herron declares that CSCP received a favorable response but later found that CCI "had added a TM to the end of [Slogan One] and was also using the confusingly similar [Slogan Two] on its website." *Id*. Andrew Gjerness as CCI's corporate representative testified that CCI first became aware CSCP had used Slogan One when CCI received the cease and desist letter from CSCP sometime in March or April of 2017. Dkt. 123, Ex. 3 at 12–13. Andrew Gjerness also testified that in May, June, or July of 2017, a new sales manager at CCI, Mike Tutsie, "got competitive bids from quite a few of our competitors to kind of understand how the process was" which was the first time CCI "actually saw" that CSCP was using CCI's documents, specifically the Project Graph and Project Bid Sheet. Dkt. 123, Ex. 3 at 20, 42, 53, 56.

On July 6, 2017, CCI submitted an application for protection of Slogan One with the United State Patent and Trademark Office ("USPTO"). Dkt. 57-1 at 51. CSCP also filed for protection of Slogan One with the USPTO, which issued a Notice of Publication on July 12, 2017, announcing its intent to register Slogan One to CSCP. Sweeney Decl. at 15–24. Andrew Gjerness as CCI's corporate representative testified that in June or July 2017, CCI became aware through checking social media to compare competitor's advertisements that CSCP was changing their name to Crawl Pros. Dkt. 121, Ex. 3 at 12. Herron testified as CSCP's corporate representative that CSCP changed its name because it was entering the Portland, Oregon market in August of 2017 and because it owned the

CrawlPros.com domain name. Dkt. 121, Ex. 2, at 211. Herron also testified as CSCP President that CSCP's goal was to entirely switch the name under which CSCP does business from Crawl Space Cleaning Pros to Crawl Pros by the end of 2019. Dkt. 123, Ex. 4 at 31.

On August 14, 2017, CSCP filed a complaint against CCI in the Pierce County Superior Court for the State of Washington for violation of Washington's Trademark Registration Act, RCW Chapter 19.77 *et seq.*, common law trademark infringement, and violation of Washington's Consumer Protection Act ("CPA"), RCW Chapter 19.86. Dkt. 39 at 5. On September 6, 2017, CCI filed this lawsuit against CSCP, alleging copyright infringement, trademark infringement, false designation of origin and unfair competition in violation of the CPA, and seeking a permanent injunction against infringement of the copyrighted materials and the trademarked materials, destruction of all infringing materials, damages, and other relief. Dkt. 1. On October 10, 2017, CCI registered Slogan Two as a service mark with the USPTO. Dkt. 57-1 at 53. On November 28, 2017, CCI filed a Notice of Opposition to CSCP's application for protection of Slogan One with the federal Trademark Trial and Appeal Board, Sweeney Decl. at 26–31, citing CCI's July 6 application for protection of Slogan One, *see* Dkt. 57-1 at 51.[8]

On March 19, 2018, CSCP filed an amended answer in the instant case, asserting counterclaims and affirmative defenses including laches. Dkt. 32. On September 6, 2018, CSCP filed a motion for summary judgment. Dkt. 39. On January 29, 2019, the Court

---

[8] CSCP informed the Court that this proceeding is suspended pending the outcome of the instant suit. Dkt. 39 at 4.

granted the motion as to CCI's copyright claims for two of the five copyrighted documents at issue. Dkt. 75 at 40. The Court denied summary judgement as to CCI's trademark claims, and reserved ruling and requested supplemental briefing as to CCI's copyright claims for the remaining three documents, a Project Graph, a Project Bid Sheet, and a Venting Calculator. *Id*. On March 1, 2019, in response to CSCP's request for a continuance, Dkt. 86, and CCI's notice of non-opposition, Dkt. 101, the Court granted the motion for a continuance and struck the scheduling order based on the then-existing trial date. Dkt. 105. On May 31, 2019, the Court ruled on the remaining questions from CSCP's motion for summary judgment and granted summary judgment only as to the second page of the Venting Calculator document and denied summary judgment as to the remainder of the motion. Dkt. 112.

On July 11, 2019, CSCP filed its second motion for partial summary judgment. Dkt. 120. On July 29, 2019, CCI responded. Dkt. 122. On August 2, 2019, CSCP replied. Dkt. 126.

On August 6, 2019, CCI filed a motion for leave to file Dkt. 128, Second Henrichsen Declaration. Dkt. 129. CSCP did not respond.

On September 25, 2019, in response to the parties' joint status reports, the Court set a new trial date and new pretrial deadlines including a new dispositive motions deadline of October 16, 2019. Dkt. 136.

## II. DISCUSSION

**A.    Summary Judgment Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically

attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

**B.      Motion for Leave to File the Second Henrichsen Declaration**

In its motion, CCI explains that though the substance of the Second Henrichsen Declaration was extensively cited in its opposition papers, Dkt. 122, CCI's counsel inadvertently did not include the declaration in its supporting exhibits. Dkt. 129 at 1. CCI asks the Court for leave to file the declaration. *Id.* CSCP did not respond to the motion. CCI explains that on August 5, 2019 when it discovered the error, it notified CSCP and served the declaration immediately, though this occurred after CSCP's reply was due and filed. *Id*. at 2. CCI argues and provides a supporting declaration that CSCP's counsel confirmed by phone it would not be prejudiced by the error. *Id*.; Dkt. 130, ⁋ 5.

Federal Rule of Civil Procedure 6(b)(1)(B) provides that when an act must be performed within a specified time, a court may for good cause extend the time "on motion made after the time has expired if the party failed to act because of excusable neglect." Neglect includes negligence and inadvertence. *Briones v. Riviera Hotel & Casino*, 116 F.3d 379, 381 (9th Cir. 1997) (citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 391 (1993)). Whether neglect is "excusable" in motions under Rule 6(b) should be determined by (1) the danger of prejudice to the

opposing party, (2) the length of the delay and its impact on the proceedings, (3) the reason for the delay, and (4) whether the movant acted in good faith. *Id.* (citing *Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814 (9th Cir. 1996)). Here, the Court finds no evidence of prejudice, a lack of identifiable impact on the proceedings (as it appears the substance of the declaration was clear from CCI's motion), and no indication of bad faith. To avoid potential prejudice to CSCP, the Court will rely on the substance of the declaration as represented in CCI's motion—the substance that was available to CSCP in crafting its reply. Therefore, the Court grants CCI's motion for leave to file the Second Henrichsen Declaration, Dkt. 129.

## C. Merits

CSCP asks the Court to grant summary judgment on all of CCI's remaining trademark claims and on all equitable relief sought for CCI's remaining copyright claims based on CSCP's affirmative laches defense.

### 1. Trademark Claims

In its complaint, CCI makes three primary trademark allegations: (1) that CSCP's trade name Crawl Space Cleaning Pros creates a strong likelihood of consumer confusion with CCI's trade name Clean Crawls, (2) that CCI has the rights to Slogan One and CSCP's use of Slogan One directly infringes on those rights, and (3) that CSCP's use of Slogan One creates a likelihood of confusion with and thus infringes CCI's rights in Slogan Two. Dkt. 1, ¶¶ 15–20, 24–27.

In its previous motion for partial summary judgment, CSCP argued that all of CCI's trademark claims were barred by laches based on the Henrichsen Declaration and

the Declaration of Dale Gjerness, Dkt. 50. *See* Dkt. 75 at 27. The Court found that neither

declaration clearly established CSCP's contention that CCI knew of CSCP's alleged

trademark infringement since 2012. *Id.* CSCP moves again for summary judgment on

laches arguing that additional discovery bolsters its case, including deposition testimony

from CCI's corporate representative Andrew Gjerness and from Henrichsen, CCI's

President. Dkt. 120 at 1.

   The parties now also raise the issue that any CCI allegations about CSCP's shift to

the trade name Crawl Pros are not addressed in CCI's complaint. While CCI argues that

these allegations are already contemplated as part of this case, it requests leave to

supplement its pleadings pursuant to Fed. R. Civ. P. 15(d) should the Court find it

necessary. Dkt. 122 at 24. CSCP argues, and the Court agrees, that plaintiffs may not

supplement their complaints to avoid summary judgment. Dkt. 126 at 11–12. *See, e.g.*

*Glesenkamp v. Nationwide Mut. Ins. Co.*, 71 F.R.D. 1 (N.D. Cal. 1974), *aff'd per curiam,*

540 F.2d 458 (1976) ("The liberal amendment policy of the Federal Rules was not

intended to allow a party to circumvent the effects of summary judgment by amending

the complaint every time a termination of the action threatens."). However, this Order

does not terminate the action, and CCI may file a motion to amend or supplement as it

finds appropriate. The Court will assess the equities of amendment if CCI files such a

motion. The Court will not analyze CCI's claims regarding CSCP's use of the trade name

Crawl Pros because it is now clear that those claims are outside the pleadings and thus

not properly before the Court.

### a. Knowledge and the Presumption of Laches

"To establish that laches bars a claim, a defendant must 'prove both an unreasonable delay by the plaintiff and prejudice to itself.'" *Eat Right Foods Ltd v. Whole Foods Market, Inc.*, 880 F.3d 1109, 1116 (9th Cir. 2018) ("*Eat Right*") (quoting *Evergreen Safety Council v. RSA Network Inc.*, 697 F.3d 1221, 1226 (9th Cir. 2012)). "Determining whether a delay was unreasonable requires answering two questions: how long was the delay, and what was the reason for it?" *Id.* (citing *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 838 (9th Cir. 2002)). "To measure the length of a delay, we start the clock 'when the plaintiff knew (or should have known) of the allegedly infringing conduct,' and we stop it when 'the lawsuit in which the defendant seeks to invoke the laches defense' is initiated." *Id.* (quoting *Evergreen Safety Council*, 697 F.3d at 1226). "If the most analogous state statute of limitations expired before the suit was filed, there is a strong presumption in favor of laches." *Pinkette Clothing, Inc. v. Cosmetic Warriors Limited*, 894 F.3d 1015, 1025 (9th Cir. 2018). Conversely, "[i]f the plaintiff filed suit within the analogous limitations period, the strong presumption is that laches is inapplicable." *Jarrow*, 304 F.3d at 835–36 (citation omitted).

The parties do not dispute and the Court agrees that the most analogous state statute of limitations for the trademark infringement claims is Washington's three-year statute of limitations on claims for trade name infringement. *See* Dkt. 120 at 10; Dkt. 122 at 11 ("CSCP must show that CCI 'knew or should have known' it had a cause of action against CCP for trademark infringement . . . sometime before September 6, 2014."); *see also Eat Right*, 880 F.3d at 1115 (parties agreed Washington's three-year statute of

limitations for trade name infringement was analogous for Lanham Act trade name claims). CCI filed suit on September 6, 2017. Dkt. 1. Thus if CCI knew or should have known of CSCP's alleged infringement prior to September 6, 2014, the presumption is that laches applies.

"The essence of [a trademark infringement claim] centers on the likelihood of confusion between two marks or products." *Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.*, 559 F.3d 985, 990 (9th Cir. 2009) (citing *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000); *Brookfield Comms., Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1053 (9th Cir. 1999)). "Thus, the question is whether [the plaintiff] knew or should have known about the likelihood of confusion between its mark and [the defendant's] mark." *Id*. Actual knowledge of infringement is not required; the Ninth Circuit explained "[o]n multiple occasions, we have held that laches barred an otherwise meritorious trademark or copyright claim because the plaintiff had constructive knowledge of potentially infringing activity outside the limitations period." *Id.* (citing *Evergreen Safety Council*, 697 F.3d at 1227; *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 999 (9th Cir. 2006); *E-Systems, Inc. v. Monitek, Inc.*, 720 F.2d 605, 607 (9th Cir. 1983) ("*E-Systems*")).

While CSCP argues that the Court may proceed to a laches analysis even if a dispute of material fact exists about when CCI knew or had reason to know about potentially infringing activity, Dkt. 126 at 4, the Court must not resolve a dispute of material fact in favor of the moving party at summary judgment. *See, e.g.*, *Jarrow*, 304 F.3d at 833–34 ("we review de novo whether the district court inappropriately resolved

any disputed material facts in reaching its decision."). However, the Court may exercise discretion in applying the laches doctrine to the facts. *Eat Right*, 880 F.3d at 1115.

The parties dispute whether and when CCI knew or had reason to know of CSCP's infringement and also dispute whether the laches period should be established separately for each mark at issue. Neither party cites authority on the issue of separate analyses. CSCP appears to argue that laches should be decided jointly as to all of CCI's trademark infringement claims. *See* Dkt. 126 at 3 ("CCI further asserts that CSCP must satisfy the Ninth Circuit's laches analysis for each and every concomitant use of the three marks or trade names at issue.") (footnote omitted). Because each trademark represents a property right, the Court will analyze each mark separately. *See New Kids on the Block v. News Am. Pub., Inc.*, 971 F.3d 302, 306 (9th Cir. 1992) ("A trademark is a limited property right in a particular word, phrase, or symbol.").

The parties' dispute about whether constructive knowledge should be imputed to CCI includes an apparent disagreement about what standard the Court should use to makes its determination. In discussing constructive knowledge, CSCP emphasizes CCI's lack of reasonable diligence and failure to police its marks, arguing that "a reasonably prudent business person seeking to police its marks in Henrichsen's position" would have recognized the likelihood of confusion as early as mid-2013 when he became aware of CSCP's operations and should have taken steps to enforce CCI's rights. Dkt. 120 at 13–14. CCI counters that "given that CSCP's admitted significant expansion and growth did not occur until 2016, the evidence—viewed it [sic] the light most favorable to CCI—

confirms that a possible knowledge . . . whether actual or constructive, would not have occurred prior to 2016 at the earliest." Dkt. 122 at 12.

Though the concept of what a plaintiff "should have known" could on its terms include what a reasonable person should have done to investigate possible infringement, the Court finds that courts conduct this analysis in the context of the *E-Systems* factors courts use to assess the equity of a laches defense. *See, e.g. Pinkette Clothing*, 894 F.3d at 1027 (In finding plaintiff was not diligent, the Ninth Circuit reasoned "[e]ven though [plaintiff's] outside counsel received notice of [defendant's] registration application, and even though [plaintiff] otherwise strictly polices its mark, [plaintiff] waited . . . to file its petition for cancellation.").

The Court finds that Ninth Circuit analysis of constructive knowledge to start the laches clock considers actions a plaintiff took or information they were exposed to based on the plaintiff's actions during the period of infringement, not actions a plaintiff should have taken to gather knowledge but did not. In *Eat Right*, the Circuit found constructive knowledge when the plaintiff had an ongoing business relationship with the defendant, the defendant publicized the program incorporating the allegedly infringing mark on its website, the plaintiff's managing director visited one of the defendant's stores when the mark was displayed, referenced a campaign with the mark in e-mails to defendant's staff, and knew an entity affiliated with the defendant had attempted to register the mark. 880 F.3d at 1116–17. In *Internet Specialties*, the Circuit found a plaintiff should have recognized the likelihood of confusion between company names and thus possessed constructive knowledge when, though their service lines did not entirely overlap, the

companies offered many of the same services "in the same geographic area under remarkably similar names." 559 F.3d at 990. In *Tillamook Country Smoker, Inc. v. Tillamook Cty. Creamery Ass'n*, 465 F.3d 1102, 1109 (9th Cir. 2006), defendant sold plaintiff's complimentary products through its "catalog, factory store, and website" for more than twenty years. The Ninth Circuit rejected the argument that laches should be delayed until the products shared the same primary channel of distribution, finding actual knowledge was present, and likelihood of confusion was or should have been recognized when "the two companies were using similar marks on complimentary products in the same geographical area, creating the prospect of confusion." *Id*. In *Miller*, where plaintiffs the Millers alleged defendant Glenn Miller Productions ("GMP") was improperly sub-licensing plaintiffs' intellectual property without permission, the Ninth Circuit found that:

> [T]he Millers' status as GMP shareholders, their involvement in GMP matters since 1979, Steven Miller's attendance at six Glenn Miller Orchestra performance since the early 1990s at which merchandise was advertised and sold in prominent locations, Steven Miller's admitted knowledge that GMP sold CDs at one such concert, and GMP's open and notorious sale of merchandise on its website were more than sufficient to give Plaintiffs constructive knowledge that during the 1980s and 1990s (and in any case, long before January 1999), GMP was selling merchandise bearing the Glenn Miller Orchestra mark.

*Miller*, 454 F.3d at 999. In *E-Systems*, the Circuit found that "[b]ecause plaintiff and defendant advertised in the same magazines and exhibited at the same trade fairs, plaintiff had ample opportunity to discover defendant's activities [using a confusingly similar trade name] before defendant developed a substantial business." 720 F.3d at 607.

Regarding what occurred to expose CCI to CSCP's actions, CSCP argues that CCI had actual knowledge of infringement of CCI's trade name and of Slogan One as early as mid-2013 and certainly by Spring 2014. Dkt. 120 at 12. CSCP emphasizes three points: (1) CCI's corporate representative testified that CCI was aware in mid-2013 that CSCP was doing business, (2) Henrichsen testified that he attended the Seattle Home Show sometime in 2013 or 2014 and saw CSCP's booth and the banners on its booth, and (3) Herron testified that when he was working at CSCP's Seattle Home Show booth in Spring 2014, Henrichsen came by the booth, read Slogan One out loud from a banner on the booth, and told Herron it was a great slogan. *Id*.

While CSCP relies on its allegation that CCI had actual knowledge of CSCP's trade name by mid-2013 and Henrichsen had actual knowledge of CSCP's use of Slogan One by the spring of 2014 (as analyzed below), it raises five additional points in support of its argument that the Court should at least find CCI had constructive knowledge of the alleged infringement prior to September 6, 2014. These points are: (1) that Henrichsen served as president of the WWA in 2014 and should be presumed aware of the WWA's members, (2) that employees transferred between CCI and CSCP in 2014, (3) that the companies had "various interactions at trade and industry meetings," (4) that Dale Gjerness of CCI testified that he observed CSCP trucks and uniforms, and (5) that Henrichsen testified that he learned of CSCP's infringement "a couple of years ago." Dkt. 120 at 14 (citing Dkt. 40, ¶ 22; Dkt. 121, Ex. 4 at 36, 85, 86, 116, Ex. 5 at 56–57, 63, 64, Ex. 6 at 76–77; Dkt. 119, Ex. A at 168–69). The Court summarizes CCI's counterarguments as follows: (1) Henrichsen's knowledge of CSCP's membership in the

WWA did not necessarily expose him to CSCP's use of marks in commerce as required for a trademark claim, (2) employees who went to CSCP and later returned to CCI may have returned after September 6, 2014; in any event, this employee crossover did not necessarily expose CCI to CSCP's use of marks, (3) attendance at industry meetings does not clearly entail exposure to CSCP's use of marks, (4) Dale Gjerness testified that he may have seen a CSCP truck *at some point prior to March 2017* and that *at some point* he saw a CSCP employee in a jacket or a shirt at a meeting that said Crawl Space Cleaning Pros, none of which establish exposure before September 6, 2014, and (5) Henrichsen's testimony was in 2019, so testimony that he learned of infringement "a couple of years ago" did not reference a date prior to September 6, 2014. *See* Dkt. 122 at 12–13. The Court considers these facts in the context of CCI's argument that it "did not know, and did not have reason to know, that CSCP was using its company name *in its branding as a trademark* until years later." Dkt. 122 at 11–12 (emphasis added). Though it is somewhat of a close question, the Court finds that none of these facts clearly establish CCI was exposed to CSCP's use of marks between CSCP's inception in mid-2013 and the operative date of September 6, 2014.

The Court turns next to the interaction between Herron and Henrichsen at the Seattle Home Show. CCI "hotly dispute[s]" Herron's account of his interaction with Henrichsen at the Seattle Home Show. Dkt. 122 at 4. The Court finds the facts regarding the Seattle Home Show interaction are as follows. Herron testified that Henrichsen read Slogan One off the banner. Dkt. 121, Ex. 2 at 64. Henrichsen declared that he did not do so. Dkt. 122 at 5 (citing Second Henrichsen Decl., ⁋ 3). While Henrichsen denies having

seen Slogan One, Herron's testimony is some evidence that the Slogan was displayed on a banner at the Home Show.[9] While Henrichsen's declaration creates a question of fact about whether Henrichsen saw Slogan One, Henrichsen testifies (and does not dispute in declaration) that he the first time he saw CSCP at the Seattle Home Show would have been at some point in 2013 or 2014. *Compare* Dkt. 123, Ex. 2 at 77 *with* Dkt. 122 at 5 (citing Second Henrichsen Decl., ¶ 3). Construing all facts in favor of CCI, because the Seattle Home Show occurs twice a year, this interaction could have occurred in the fall of 2014. Dkt. 122 at 4. Because neither party provides the date of the Seattle Home show in the fall of 2014, this interaction could have occurred sometime later than September 6, 2014.

From these facts, the Court makes the following determinations. CSCP has put forward evidence that Slogan One was displayed on a banner at CSCP's booth at the Home Show, sometime during 2013 or 2014 when Henrichsen was there and aware of CSCP's presence. While CCI's evidence creates a question of material fact about whether Henrichsen actually observed Slogan One, it does not contradict CSCP's evidence about whether Slogan One was displayed in Henrichsen's presence. However, CCI's evidence also creates a question of fact about whether Slogan One was displayed in Henrichsen's presence prior to September 6, 2014. Because this exposure could have occurred outside the limitations period, and because the other interactions do not conclusively establish

---

[9] Herron's declaration in support of CSCP's first motion for summary judgment explains that CSCP purchased a 2' x 8' banner with Slogan One at the top prior to the June 2013 Mother Earth News Festival and includes a photograph of the booth displaying the banner and a receipt for the banner dated May 23, 2013. Dkt. 40, ¶ 6 (citing Ex. B).

CCI's exposure to CSCP's use of Slogan One, the Court finds that constructive knowledge of CSCP's use of Slogan One may not be clearly imputed to CCI before September 6, 2014.[10]

Though CCI appears to dispute its knowledge of the extent of CSCP's operations, it does not dispute its leadership knew Herron had started a business with the name Crawl Space Cleaning Pros by the middle of 2013. Herron and Henrichsen were known to each other, and it appears undisputed that the businesses offered substantially the same services from CSCP's inception. The precise geographic outlines of each company's service area between mid-2013 and September 6, 2014 are not clear from the record, but both companies appear to have operated at that time in Northwestern Washington. CCI argues that actual customer confusion did not occur "until years later, after CSCP had grown, at which point a claim for trademark infringement accrued . . . ." Dkt. 122 at 12. However, actual customer confusion is only one of the eight factors which a court considers in a claim of trademark infringement, and a plaintiff can prove a claim without actual evidence of customer confusion. *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979).

Thus, the question is whether CCI should have known in the relatively brief period between mid-2013 and September 6, 2014 that there was a likelihood of confusion between two companies with similar names offering the same services in much the same

---

[10] CCI certainly had actual knowledge of CSCP's use of Slogan One by the spring of 2017 when CCI received CSCP's cease-and-desist letter, Dkt. 123, Ex. 3 at 12–13, but this point is well past the limitations period.

locations without any definitively established instances where CCI's leadership was exposed to CSCP's use of its name as a trade name. The answer requires determining whether CCI should have heard CSCP's name, undertaken an investigation (however minor) to determine how CSCP was using its name in commerce, and with that information, evaluated its potential cause of action. *Jarrow*, 304 F.3d at 838. Though it is again a close question, the Court concludes that particularly with the uncertainty of the date of the trade show as discussed (where Henrichsen would have been exposed to CSCP's use of its name in commerce) there is not a date prior to September 6, 2014 at which it may clearly assign constructive knowledge of CSCP's use of the Crawl Space Cleaning Pros trade name in commerce to CCI.

Because other claims are going to the jury, the Court finds it is also appropriate to let the jury consider the factual questions at issue regarding knowledge. Though the Court finds constructive knowledge of both CSCP's trade name and Slogan One could be assigned to CCI at least by the end of 2014, that date could easily fall after September 6, 2014. Therefore, the presumption is that laches does not apply to CCI's claim regarding CSCP's trade name or to CCI's claim regarding CSCP's use of Slogan One.

### b.     Equity of A Laches Defense

The presumption that laches applies may be rebutted if the plaintiff can show its delay was reasonable. *Eat Right*, 880 F.3d at 1117. While CSCP does not cite to authority so establishing, it appears that the presumption laches does not apply is also rebuttable in rare circumstances. *See Jarrow*, 304 F.3d at 835–36 (quoting *Shouse v. Pierce Cty.*, 669 F.2d 1142, 1147 (9th Cir. 1997) ("It is extremely rare for laches to be effectively invoked

when a plaintiff has filed his action before limitations in an analogous action at law has run.")).

District courts balance six factors to determine if the trademark owner's delay in filing suit was unreasonable and thus barred:

> (1) strength and value of the trademark rights asserted; (2) plaintiff's diligence in enforcing mark; (3) harm to senior user if relief is denied; (4) good faith ignorance by junior user; (5) competition between senior and junior users; and (6) extent of harm suffered by the junior user because of senior user's delay.

*Tillamook*, 465 F.3d at 1108 (quoting *E-Systems*, 720 F.2d at 607). The Court is doubtful that this case presents the rare circumstance where laches is appropriate when questions of fact preclude a conclusion that CCI filed outside the statute of limitations. However, because constructive knowledge could be attributed just outside the statute of limitations, the Court will briefly address the *E-Systems* factors.

Regarding the first factor, strength and value of the rights asserted, CSCP concedes that in light of the Court's previous finding that a question of fact exists as to whether CCI's mark is suggestive and that CCI put forward evidence of substantial advertising and sales, this factor does not weigh in CSCP's favor. Dkt. 120 at 15 (citing Dkt. 75 at 9–15).

Regarding the second factor, diligence in enforcement, "[r]easonable justifications for a delay include exhausting remedies through administrative processes, evaluating and preparing complicated claims, and determining 'whether the scope of proposed infringement will justify the cost of litigation.'" *Jarrow*, 304 F.3d at 835–36 (quoting *Evergreen Safety Council*, 697 F.3d at 1227). Courts have also recognized that plaintiffs

may legitimately put off filing suit when pursuing settlement negotiations with the alleged infringer. *Eat Right*, 880 F.3d at 1119. CCI does not put forward any reason courts have recognized as a legitimate excuse for its delay in filing suit.

CCI argues that it did not have reason to know about CSCP's marketing efforts because "CSCP admittedly did not expand into CCI's home territory until 2016, and did not experience significant company growth until 2017." Dkt. 122 at 12. CCI argues that its delay was not unreasonable "considering all the activities that go into starting a business and the uncertainty as to how that business would perform." *Id*. at 16. However, CCI does not argue that its leadership *in fact* delayed because they expected CSCP would fail, or believed that the scope of infringement would not justify the cost of litigation. *Jarrow*, F.3d at 835–36.[11]

CCI argues that it delayed in filing suit because it "had no reason to recognize its potential cause of action until it experienced actual confusion" and "promptly filed the present lawsuit against CSCP's infringement in 2017 within months after its efforts at amicable settlement with CSCP broke down." *Id*. at 17. However, actual confusion is not required to recognize a potential cause of action, and it is difficult to distinguish CCI's own characterization of its conduct from what the Ninth Circuit has warned is impermissible—waiting "'to see how successful the defendant's business will be and then ask for an injunction to take away good will developed by defendant in the

---

[11] In the copyright section of its motion, CCI explains that the Supreme Court in *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663 (2014) ("*Petrella*") acknowledged that companies may wait to see whether the scope of infringement justifies the cost of litigation but does not explicitly argue that *CCI actually delayed* for this reason.

interim.'" *Grupo Gigante SA De CV v. Dallo & Co.*, 391 F.3d 1088, 1102–03 (9th Cir. 2004) (quoting 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 31:14 (4th ed. 2002)).

Courts may also excuse delay in the face of progressive encroachment, when a senior owner waits until "'the junior user of a mark moves into direct competition . . . selling the same 'product' through the same channels and causing actual market confusion." *Tillamook*, 465 F.3d at 1110 (quoting *Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp. of Cal.*, 694 F.3d 1150, 1154 (9th Cir. 1982)). "Common methods of encroachment are the junior user's expansion of its business into different regions or into different markets." *Id.* (citing *Grupo Gigante*, 391 F.3d at 1103). Conversely, "[a] junior user's growth of its existing business and the concomitant increase in its use of the mark do not constitute progressive encroachment." *Id.* (citing *Prudential Ins.*, 694 F.3d at 1154). However, when potential conflict is anticipated, choosing to wait until conflict is actual rather than potential is "not an excuse and did not constitute progressive encroachment." *Internet Specialties*, 559 F.3d at 991 (citing *Grupo Gigante*, 391 F.3d at 1103). Here, where the two companies' service lines were substantially similar from the start and CSCP operations were at least geographically contiguous to CCI's from the start, normal business growth would very likely, and would reasonably be anticipated to more directly overlap with CCI's most central service area. On the facts presented, progressive encroachment does not excuse CCI's delay. Because CCI has failed to make a case that its delay was reasonable, this factor weighs substantially in favor of applying laches.

Regarding the third factor, harm to the senior user if relief is denied, the Court previously found that CCI put forward what appeared to be strong evidence of customer confusion, which negatively impacted customer perception of CCI's reliability. Dkt. 75 at 18. CSCP argues that "delay weakens a claim of a likelihood of confusion, because the public may learn to distinguish between similar marks over time . . . ." Dkt. 120 at 16 (citing *Grupo Gigante*, 391 F.3d at 1103–04). CCI's evidence of confusion, cited in the Court's prior order, could support an inference that the public was not making this adjustment. Dkt. 75 at 18–19. Therefore, this factor weighs against applying laches.

Regarding the fourth factor, good faith ignorance by the junior user, CSCP argues that it used both its trade name and Slogan One widely in advertising throughout the Puget Sound, supporting an inference that it claimed its marks in good faith. Dkt. 120 at 17. CCI counters that CSCP was aware CCI was using its trade name and Slogan One when CSCP adopted them. Dkt. 122 at 17. The Court previously found regarding the similar "defendant's intent" factor that a reasonable juror could draw conflicting inferences on intent, making this factor neutral as to both the trade name and Slogan One. Dkt. 75 at 17–18. Moreover, the disputes of fact about priority of usage for Slogan One prevent clear resolution of knowledge and intent here—if a jury concludes CCI had priority in usage, this factor would weigh against laches.

Regarding the fifth factor, competition between senior and junior users, CSCP concedes that as it competes with CCI, this factor weighs against applying laches. Dkt. 120 at 6.

Regarding the sixth factor, harm suffered by the junior user because of the senior user's delay, courts consider that "[e]ven where a defendant establishes that a plaintiff delayed unreasonably in filing suit, laches will not bar a claim unless that delay prejudiced the defendant." *Eat Right*, 880 F.3d at 1117 (citing *Grand Canyon Trust v. Tucson Elec. Power Co.*, 391 F.3d 979, 988 (9th Cir. 2004)). While prejudice is part of the six-factor equitable analysis, a defendant must satisfy this factor to prevail and it weighs heavily in the analysis. *See id.* at 1119 (citing *Grand Canyon Trust*, 391 F.3d at 988) ("Even where a defendant establishes that a plaintiff delayed unreasonably in filing suit, laches will not bar a claim unless that delay prejudiced the defendant.")).

In *Internet Specialties*, the Ninth Circuit explained that prejudice must stem from investing in the mark "as the identity of the business in the minds of the public," and considered whether the defendant would have to "undertake significant advertising expenditures to change its name." *Internet Specialties*, 559 F.3d at 992 (citing *Jarrow*, 304 F.3d at 835–36). Later cases have considered a slightly broader concept of investment in the mark, to include investment in infrastructure and employment as examples of building a business around a trademark. *Pinkette Clothing*, 894 F.3d at 1028 (citing *Grupo Gigante*, 391 F.3d at 1105; *Whittaker Corp v. Execuair Corp.*, 736 F.3d 1341, 1347 (9th Cir. 1984)). "Establishing undue prejudice requires that the defendant show 'at least some reliance on the absence of a lawsuit.'" *Eat Right*, 880 F.3d at 1119 (quoting *Seller Agency Council, Inc. v. Kennedy Ctr. for Real Estate Educ., Inc.*, 621 F.3d 981, 989 (9th Cir. 2010)).

1    CSCP argues that it was prejudiced by the delay through its "expenditures in

2    building its business around its marks from mid-2013 through the date of CCI's filing suit

3    – September 6, 2017." Dkt. 120 at 19. CSCP argues that it was prejudiced by the absence

4    of a lawsuit because during this period it added to its liability by, without knowledge of

5    the alleged infringement, continuing the practices CCI alleges were infringing. Dkt. 120

6    at 19 n.98 (citing *Whitaker*, 736 F.2d at 1347). CSCP also argues that like the defendant

7    in *Jarrow*, if it had known of the alleged infringement, it could have focused on

8    characterizing its product differently to the public. *Id.* (citing *Jarrow*, 304 F.3d at 839).

9    CCI argues that any expectations-based prejudice CSCP has sustained is negated by its

10   "re-branding" to the trade name Crawl Pros. Dkt. 122 at 3.  The Court finds that the

11   evidence put forward by CSCP shows substantial expenditures on marketing through

12   various mediums each year between mid-2013 and September 2017 and substantial

13   revenue growth during that period, which could support a finding of substantial prejudice.

14   Dkt. 120 at 6–8, 19. These expenditures indicate CSCP invested heavily in marketing

15   using its trade name and Slogan One essentially from the inception of its business such

16   that it could reasonably say it built its business around the marks during the period CCI

17   delayed. Rebranding to Crawl Pros would not impact investment around Slogan One, and

18   it is unclear that the change in trade name would entirely obviate previous investment in a

19   similar trade name.

20        The Court finds that the first, third, and fifth factors weigh against applying laches,

21   and the fourth factor is neutral. Even though the important second and sixth factors weigh

22   in favor, the Court concludes that this mixed equitable analysis is not sufficient to

overcome the strong presumption against laches for CCI's Lanham Act claims established by the lack of conclusive evidence that the laches period started prior to the statute of limitations. The Court's evaluation may be different following factual findings by a jury.

### 2. CPA Claims

CSCP argues that CCI's claims for damages under the CPA are barred by the four-year CPA statute of limitations, because CCI's CPA claim accrued in mid-2013, more than four years before CCI filed suit on September 6, 2017. Dkt. 120 at 20 (citing RCW 19.86.120). Guided by its determination that neither actual nor constructive knowledge may be conclusively attributed to CCI prior to September 6, 2014, the Court denies CSCP's motion for summary judgment as to CCI's claims for damages under the CPA.

CSCP also argues that any CCI claims for equitable relief under the CPA for the purposes of a laches analysis would be guided by the three-year statute of limitation applied in laches to CCI's Lanham Act claims, Dkt. 120 at 10 & 10 n.72. Said another way, CSCP argues that equitable relief for trade name infringement that also violates the CPA would be governed for the purposes of a laches analysis by the three-year statute of limitations that applies to trade name infringement, RCW 4.16.080(2), not the four-year statute of limitations for claims for damages brought under the CPA, RCW 19.86.120.

CSCP is correct that this Court has found that "the analysis of an unfair competition claim under Washington's Consumer Protection Act will generally follow that of the trademark infringement claim . . . ." *Safeworks, LLC v. Spydercrane.com, LLC*, No. 08-cv-0922-JPD, 2009 WL 3169151, at *8 (W.D. Wash, Sept. 29, 2009).

However, that analysis decided whether to apply the likelihood of consumer confusion test, not what statute of limitations should guide a laches analysis for equitable relief under the CPA. CSCP argues that CCI's CPA claim accrued contemporaneously with CCI's Latham Act claims. Dkt. 120 at 20. CCI counters that CSCP cannot prove CCI suffered injury sufficient for its claim to fully accrue prior to September 6, 2013 following a four-year statute of limitations. Dkt. 122 at 21.

The Court finds that though Lanham Act claims and trademark-based unfair competition claims are subject to congruous substantive analysis, the CPA's own statute of limitations is the most appropriate statute of limitations to guide a laches analysis for equitable relief under the CPA. Therefore, the Court denies CSCP's motion as to equitable relief under the CPA for the same reasons it denied CSCP's motion as to CCI's Lanham Act claims.

### 3.    Copyright Claims

In copyright, laches is not available as a defense to suits for damages brought within the three-year statute of limitations. *Petrella*, 572 U.S. at 677. Laches is available in extraordinary circumstances to limit equitable relief in copyright actions brought within the three-year statute of limitations. *Id.* at 685 ("In extraordinary circumstances, however, the consequences of a delay in commencing suit may be of sufficient magnitude to warrant, at the very outset of the litigation, curtailment of the relief equitably awardable."). As examples of extraordinary circumstances which might warrant curtailment of equitable relief at summary judgment, the Supreme Court cited *Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227 (6th Cir. 2007), where the requested

injunctive relief was destroying a housing project which would harm innocent third parties, and *New Era Publications Int'l v. Henry Holt & Co.*, 873 F.2d 576, 584–85 (2d Cir. 1989), where the requested injunctive relief was total destruction of a book allegedly containing infringing material that due to delay had already been printed, packed, and shipped. *Id*. at 685–86. In more ordinary circumstances, if the plaintiff ultimately prevails on the merits, the court may then consider the delay in commencing suit in fashioning appropriate injunctive relief. *Id*. at 687.

"[W]hile the statute of limitations [for copyright infringement] is triggered only by violations—*i.e.,* actual infringements—the laches period may be triggered when a plaintiff knows or has reason to know about an *impending* infringement." *Kling v. Hallmark Cards Inc.*, 225 F.3d 1030, 1038 (9th Cir. 2000) (emphasis in original). The Supreme Court also noted that nine Courts of Appeals follow a "'discovery rule,' which starts the limitations period when 'the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim.'" *Petrella*, 574 U.S. at 670 n.4 (quoting *William A. Graham Co. v. Haughey*, 568 F.3d 425, 433 (3d Cir. 2009)).

CCI initially brought copyright claims regarding five documents: (1) Project Graph, (2) Project Bid Sheet, (3) Project Worksheet, (4) Clean Crawls Standards, and (5) Venting Calculator. Dkt. 1, ¶ 12. The Court granted summary judgment for CSCP as to the Project Worksheet and Standards documents, Dkt. 75 at 40, and as to the second page of the Venting Calculator, Dkt. 112 at 16–17.

CSCP argues CCI's copyright infringement claims seeking injunctive relief including an order to destroy the infringing material "should be barred by the doctrine of

laches notwithstanding the fact that CCI may have initiated its claims under 17 U.S.C. §§ 502 and 503 within the applicable three-year statute of limitations." Dkt. 120 at 21 (citing 17 U.S.C. § 507(b)). CSCP argues that Henrichsen's deposition testimony states CCI "acquired knowledge of CSCP's alleged copyright infringement as early as September to October of 2014." Dkt. 120 at 22 (citing Dkt. 121, Ex. 4 at 68, 71, 74, 114, 115, 116, 117). CSCP also argues that because Pullen was employed at CSCP from Spring 2014 through Fall 2014, CCI "should have investigated a direct competitor's hiring of a salesman with four-years [sic] of experience at CCI handling CCI's alleged copyrighted material." Dkt. 120 at 22.

### a.    Delay

CSCP argues that CCI unequivocally knew or should have known CSCP was using its documents by 2014. CCI counters that it did not know until 2017. Because the Court finds as detailed below that CSCP does not show the kind of prejudice that would warrant a finding of laches at summary judgment, the Court does not decide at this point whether CCI unreasonably delayed.

### b.    Prejudice

CSCP argues that it "likely would not have produced and re-produced the alleged infringing documents, much less continue to build and develop its businesses' sales practices around them, had CCI initiated its alleged infringement action in 2014," Dkt. 120 at 23, and analogizes an injunction to destroy the allegedly infringing materials to the destruction of work described in *Petrella*, Dkt. 126 at 11 (citing *Petrella*, 572 U.S. at 686). CCI counters that "the only prejudice CSCP could show is that a finding of

copyright infringement earlier would have cause it to re-tool three of its documents earlier." Dkt. 122 at 23.[12] The Court finds that even if CSCP was required to redesign three of its project assessment and tracking documents, the impacted interests are substantially less than those involved in destroying units of housing or a completed and shipped literary work. Therefore, as the Supreme Court suggested, if CCI ultimately prevails on the merits, the Court may consider a delay in commencing suit (if established) in fashioning appropriate injunctive relief and need not find at this juncture that laches entirely bars CCI's copyright claims. *See Petrella*, 574 U.S. at 687.

## III. ORDER

Therefore, it is hereby **ORDERED** that CSCP's motion for partial summary judgment, Dkt. 120, is **DENIED** and CCI's motion for leave to file declaration, Dkt. 129, is **GRANTED**.

Dated this 5th day of November, 2019.

_____
BENJAMIN H. SETTLE
United States District Judge

---

[12] The Court notes that CCI argues that according to *Petrella*, it would have been reasonable for it to delay while it assessed whether the infringing use was sufficiently harmful to justify the cost of litigation. Dkt. 122 at 23 (citing *Petrella*, 574 U.S. at 683). However, CCI does not argue that it *was* attempting to assess the cost of litigation, so it is unclear what relevance this argument has to the facts at bar.